**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| David C. Jackson, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| The Joliet Police Department, The City of Joliet | ) | JURY TRIAL DEMANDED |
| Al Roechner, Joseph Rosado, John Perona, | ) | |
| Ed Clark, Jason Opiola, and Frank Baloy, | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**

Plaintiff, David C. Jackson, by his attorneys, Vucko Law LLP, states:

## I.   NATURE OF THE PROCEEDING

*"Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' This remains true when speech concerns information related to or learned through public employment . . . . [f]or government employees are often in the best position to know what ails the agencies for which they work."*

-   *Lane v. Franks*[1]

1.   David C. Jackson is a long-time member of the Joliet police force and President of the Joliet Black Police Officers Association. This is his First Amendment case against his employer, the Joliet Police Department, the City of Joliet, and the officers who tried to silence his speech in opposition to the Joliet Police Department's deeply entrenched racially discriminatory culture.

2.   On February 1, 2019, Jackson issued a statement on behalf of the Joliet Black Police Officers Association ("BPOA") to *The Times Weekly* regarding Joliet Police Chief Al Roechner's

---

[1] 573 U.S. 228, 231-36 (2014)

recommendation that senior BPOA member Lionel Allen be terminated. Jackson then called a meeting on behalf of the BPOA that was attended by a number of officers, community members and a Joliet councilwoman. At the two-hour meeting, among other things, Jackson questioned Roechner's decision to allow Deputy Chief Marc Reid to conduct the internal investigation that led to Allen's termination, despite the fact that Reid was named individually as a defendant in Allen's pending federal lawsuit for constitutional violations and race discrimination.

3.   In response, Roechner and his administration conspired with officers in the Crest Hill Police Department to arrest Jackson, conspired with Frank Baloy, a relative of Joliet police Sergeant Lindsey Heavener and owner of Zobel's Tavern, to obstruct Jackson's ability to obtain exculpatory evidence in the misdemeanor charges stemming from his arrest, and issued a frivolous administrative investigation charge to Jackson leading to issuance of a one-day suspension, among other things. Roechner and his administration have long used the Joliet Police Department's General Orders to silence members of the BPOA.

4.   Jackson's is also a race discrimination case and, unfortunately, it is only the tip of the iceberg. The Joliet Police Department's anti-black culture and history of retaliation dates back over twenty years. Minority Joliet police officers have long sought redress from state and federal courts, complaining of Joliet administrative level police officers' resistance to affirmative action, use of ethnic slurs, abuses of power, discriminatory promotional practices, frivolous internal affairs charges and other acts that have humiliated and embarrassed them and held them back in their careers.

5.   Jackson suffered years of abuse and retaliation at the hands of his superiors and fellow officers, Joliet's chief of police, Al Roechner, and his administration. Jackson's pleas to his police sergeants, commanders, division heads, the police chief, the City of Joliet's Human Resources

Director, the City Manager, and members of the City Council to remedy these wrongs have fallen on deaf ears. Jackson now brings this action to redress violations of his civil rights, including his rights under the First Amendment to the United States Constitution, in this federal tribunal.

## I.    PARTIES

6.    Plaintiff David C. Jackson is a detective with the Joliet Police Department. He is a resident and citizen of Illinois.

7.    The City of Joliet is a municipality in Illinois.  Its affairs are governed by a publicly elected City Council. It is an "employer" as defined by Title VII and the Illinois Human Rights Act.

8.    The Joliet Police Department is a municipal agency or other governmental unit or agency in Illinois. It is an "employer" as defined by Title VII and the Illinois Human Rights Act.

9.    Defendant Al Roechner is Chief of the Joliet Police Department.

10. Defendant Joseph Rosado is a lieutenant with the Joliet Police Department.

11. Defendant John Perona is a deputy chief with the Joliet Police Department.

12. Defendant Ed Clark is Chief of the Crest Hill Police Department.

13. Defendant Jason Opiola is a sergeant investigator with the Crest Hill Police Department.

14. Defendants Roechner, Rosado, Perona, Clark, and Opiola are being sued in their individual capacities for actions taken under color of state law.

15. Defendant Frank Baloy is the owner of Zobel's Tavern in Joliet, Illinois. He is being sued for conspiring with one or more Joliet police officers to deprive Jackson of his civil and constitutional rights.

## II.    JURISDICTION AND VENUE

16. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction), 1343 (civil rights), 1367 (supplemental jurisdiction) and 42 U.S.C. § 2000(e)-(5)(f)(3) (Title VII enforcement provisions).

17. Venue is proper pursuant to 28 U.S.C. §1391(b)(1) and (2) because Defendants reside here and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Joliet, Illinois.

### III.  FACTS

**The Joliet Police Department Has a
History of Retaliation and an Anti-black Culture**

18. The Joliet Police Department's anti-black culture and history of retaliation dates back over twenty years.

19. In 1995, a black Joliet police officer sued the City of Joliet, asserting that the Board of Fire and Police Commissioners violated an affirmative action plan when it selected a white officer for a vacancy over him.

20. Two years later, a Mexican American officer, Renaldo Hernandez, sued the Joliet P.D. and two of its officers for civil rights violations.

21. Hernandez was the vice-president of the Afro-Latino Policemen's Association and participated in the Association's efforts to have Joliet accept and implement an affirmative action plan.

22. According to court records, Hernandez "overheard Joliet officers criticize affirmative action, saying 'that those 'nigger' and 'spic' organizations were trying to get something for nothing.'" [2]

23. Court records also reflect that an officer named as a defendant in the federal lawsuit admitted that he was, in fact, opposed to affirmative action during his deposition. [3]

24. Unfortunately, the Joliet P.D.'s discriminatory and retaliatory culture remains today.

---

[2] *Hernandez v. Joliet Police Dep't*, 197 F.3d 256, 259 (7th Cir.1999).
[3] *Id.*

**Since 2007, Jackson Has Been A Victim Of**
**The Joliet Police Department's Anti-Black and Retaliatory Culture**

25. Jackson started working for the Joliet P.D. as a patrolman in 1995. Jackson is black.

26. In 2000, Jackson became a detective.

27. Beginning in 2007, Marc Reid, a newly promoted sergeant at the time, supervised Jackson. Reid is white.

28. Reid abused his supervisory position within the Department and targeted Jackson because of Jackson's race.

29. Reid harassed, belittled and stalked Jackson.

30. Jackson opposed Reid's attempts to harass and intimidate him. He told Reid at least four times that Reid was creating a hostile work environment for him.

31. Jackson reported Reid's conduct to his division head. Jackson's superior informed him that Reid was a "liked person" within the department and asked Jackson to leave Reid's shift. The division refused to investigate Reid.

32. Jackson reported the discriminatory and retaliatory conduct to the City of Joliet's Human Resources Director and asked for the City's assistance.

33. Jackson's complaints fell on deaf ears.

**The Joliet Police Department Punishes**
**Jackson for Opposing its Discriminatory Practices**

34. The Joliet P.D. does not like Jackson's resistance to its discriminatory culture and practices. From 2007 to the present, the department has singled Jackson out and issued frivolous internal affairs complaints against him.

35. In 2009, Defendant Roechner, who was a lieutenant at that time, and Joliet Police Sergeant Cardwell issued Jackson a negative performance evaluation. Roechner and Cardwell are both white.

36. Jackson contested the evaluation to his police commander and advised him that he wanted a fair evaluation.

37. Approximately three years later, in 2012, the Joliet P.D. essentially admitted it had held Jackson to a less favorable standard with regard to the 2009 evaluation in an addendum to Jackson's evaluation.

38. The unfounded internal affairs investigation complaints have held Jackson back in his career and negatively impacted his earning potential.

39. A selection committee comprised of Joliet police officers is responsible for determining whether to award promotions or transfers to officers in the department.

40. The chief of the Joliet Police Department is permitted to hand select at his discretion the officers who comprise the selection committee.

41. The selection committee can and does take negative performance evaluations and disciplinary write-ups into consideration when an officer applies for promotions or vacant positions within the department.

42. Jackson applied for multiple promotions and open positions within the Joliet P.D. during his career there and was rejected.

43. For example, in 2013, Jackson interviewed for a detective position.

44. He was denied the position.

45. Jackson learned that Reid provided the selection committee with a frivolous 2007 internal affairs complaint authored by Reid, which caused Jackson to score third on the selection list with two lesser qualified candidates above him.

### Roechner Becomes Police Chief
### and Selects Reid as his Deputy Chief

46. In 2018, Al Roechner was promoted to the position of Police Chief.

47. Before becoming chief, Roechner was a commander with the Joliet P.D.

48. In that position, Roechner used an ethnic slur to refer to African Americans in front of high-ranking officers in the watch commander's office on at least one occasion, without consequence or discipline.

49. In 2018, Reid was promoted to the position of deputy chief despite the fact that he was named as a defendant in a pending race discrimination lawsuit and that a number of internal grievances had been filed against him by Jackson for discrimination.

### Jackson Becomes President of the Black Police Officers Association,
### An Advocacy Group Targeted by Roechner and His Administration

50. In 2018, Jackson was elected president of the BPOA.

51. The BPOA is the Joliet chapter of the National Black Police Association, a national organization devoted to promoting justice, fairness and effectiveness in law enforcement, with a strong emphasis on the effects of those issues on the African American community. It serves as an advocacy forum for minority police officers.

52. Jackson's responsibilities as BPOA president include speaking publicly about the rights of the BPOA members.

53. The Joliet P.D. harasses and targets BPOA members because of their association with the BPOA.

54. BPOA member Lionel Allen has a pending lawsuit against the City of Joliet, Reid and former Joliet police chief Benton alleging that the Joliet P.D. subjected him to discrimination and retaliation. [4]

55. Court records reflect that, after Allen filed his charge of discrimination with the EEOC, Benton tried to silence Allen by telling him that he would face termination unless he withdrew his EEOC charge, agreed not to file any more charges, took a 15-day suspension and signed a last chance agreement. [5]

56. Allen also alleges that he complained that his sector had been given to a white officer who had made fun of black people. In response, the Department initiated a complaint investigation against Allen for allegedly making "malicious, harassing or frivolous complaints against fellow members of the department" in violation of Joliet Police Department General Order 7-1. [6]

**Jackson Resists Attempts by Roechner**
**And His Administration to Silence the**
**Joliet Black Police Officers Association**

57. Around December of 2018, Jackson drafted a letter to NBPA chair Sonia Pruitt. The draft was marked "Confidential" and was meant for BPOA board members only.

58. Jackson's letter referred to Lionel Allen's lawsuit and mentioned that the BPOA was very alarmed and disturbed that Roechner promoted Reid to the position of deputy chief.

59. Jackson also wrote that the BPOA was concerned that Roechner didn't take race discrimination seriously and that Roechner had used his internal affairs unit to target Allen for frivolous internal affairs complaints.

---

[4] *Allen v.City of Joliet et. al.*, Case No. 2018-cv-04047.
[5] *Id.*
[6] *Id.*

60. Jackson shared the draft with fellow board members of the BPOA, including Joliet Police Deputy Chief Gavin, for comment.

61. Jackson later learned that Gavin leaked the draft letter to Roechner.

62. The following month, in January 2019, Roechner recommended to the Board of Fire and Police Commissioners that it fire Allen.

63. Roechner's decision to fire Allen, which was made approximately 7 months after Allen filed his federal lawsuit, was highly publicized.

64. In early January 2019, Jackson requested a meeting with Roechner to discuss Allen's termination. Jackson and Roechner met at a local Joliet restaurant. Deputy Chief Perona attended the meeting to back up Roechner and attempt to intimidate Jackson.

65. Jackson made clear to Roechner and Perona that he was speaking as president of the BPOA. Jackson questioned the evidence to support Allen's termination and the personnel involved in the internal investigation of Allen.

66. Roechner gloated that he had seen the draft letter to NBPA chair Pruitt and he berated Jackson for it. Roechner said he was upset with Jackson because Jackson had earlier gone directly to Interim City Manager Marty Shanahan to recommend a diversity candidate for an open deputy chief position. Roechner said that he did not like Jackson's candidate for the position and that he did not care about diversity.

### The Joliet Police Department Ignores Jackson's Complaints About An Imposter Posing as Jackson And Making Controversial Statements on Social Media About Department Affairs

67. Approximately four days after Jackson's meeting with Roechner and Perona, on or about January 13, 2019, Jackson was notified by his police supervisor about the existence of a comment posted on the Facebook page for the Joliet Herald News.

68. The post was attributed to a Facebook user claiming to be "Dave Jackson." Jackson did not have any involvement in writing or posting the comment.

69. The Facebook post reflected details of a pending internal investigation which were known only to certain supervisory personnel in the Joliet P.D. at that time. Jackson was not privy to the investigation details cited in the Facebook post.

70. Jackson reported the Facebook post and the fake "Dave Jackson" to the head of the Investigations Unit and requested that the Joliet P.D. conduct an investigation. The Department refused to investigate.

71. Jackson also stated to his police sergeant that there was a perceived difference between the treatment of officers of color and women compared to Caucasian officers within the Joliet P.D.

72. Roechner and the Joliet P.D. treat black officers' internal complaints differently than internal complaints of white officers.

73. Jackson's complaint was again ignored.

### Jackson Issues A Statement To *The Times Weekly* On Behalf of the BPOA Concerning Senior BPOA Member Lionel Allen's Termination

74. Jackson continued to advocate for the due process rights of BPOA member Allen.

75. He informed Lt. Gavin during a January 2019 phone call that Allen was entitled to due process with regard to his termination.

76. Speaking on behalf of the BPOA, Jackson issued a statement to *The Times Weekly* on or about February 1, 2019 about Roechner's recommendation to the Board of Fire and Police Commissioners that Allen be terminated.

77. *The Times Weekly* is an online news site and print newspaper dedicated to covering news in Joliet and surrounding Will County communities.

78. *The Times Weekly*'s Editor in Chief stated to Jackson that *The Times Weekly* is "a black newspaper."

79. Jackson told *The Times Weekly*, among other things, that the BPOA wanted a "fair and non-biased hearing" for Allen. (A copy of The Times Weekly's February 1, 2019 article is attached as Exhibit A)

**Roechner And His Administration File
Frivolous Internal Affairs Charges Against
Jackson For His February 1 Statement to *The Times Weekly***

80. In March 2019, Sergeant Rouse and Lt. Rosado filed internal affairs charges against Jackson for his February 1, 2019 statement to *The Times*. Rouse and Rosado accused Jackson of making a public statement without authorization in violation of Joliet Police Department General Order 8-4.

81. Jackson told Rosado that he gave the February 1 statement to *The Times Weekly* on behalf of the BPOA and that Rosado was attacking the organization.

82. Rosado stated that a deputy chief and Chief Roechner ordered him to take action and that the internal affairs charges had been on his desk for a while.

83. The charges were filed by command level supervisors and were then investigated by those same supervisors.

84. The internal affairs charges led to Jackson receiving a one-day suspension. (A copy of the Notice of Complaint Disposition of Internal Affairs Complaint 12019-007 is attached as Ex. B; A copy of Joliet Police Department General Order 8-4 is attached as Ex. C).

85. In contrast, Sgt. Cardwell, on information and belief, was not disciplined for an inflammatory email that he sent to the Joliet Board of Fire and Police Commissioners ("BOFPC"),

which included accusations of neglect and questioning the BOFPC's integrity. Cardwell copied *The Herald News* on his email.

86. Cardwell also received no discipline for a heated exchange that he had with members of the BOFPC at a public BOFPC meeting, statements from which were reported to the media.

87. On information and belief, the Joliet P.D. also did not issue internal affairs charges to Cardwell for statements me made to the media accusing Joliet's mayor of trying to make the Joliet Police Department his "political playground."

88. Roechner and his administration, as well as past Joliet P.D. administrations, have historically singled out black officers, as well as female officers, for more severe treatment than white officers within the Department.

### Roechner Vows to Get Even with Jackson For Questioning his Handling of the Internal Investigation Leading to Allen's Termination

89. In approximately February of 2019, Jackson called a meeting on behalf of the BPOA to discuss the reasons cited for and associated process followed with regard to Allen's termination.

90. The two-hour meeting was attended by officers and community members, including Roechner, Gavin, Perona, Reid and Pastor Lonnie Posley Sr., and Joliet Councilwoman Bettye Gavin.

91. Jackson questioned the circumstances leading to Roechner's decision to recommend Allen's termination and his process involved in reaching that decision.

92. Jackson questioned the Joliet P.D. allowing Reid to conduct the internal investigation on Allen, considering that Reid was individually named as a defendant in Allen's then-pending race discrimination lawsuit.

93. Roechner berated Jackson as if disciplining a child for questioning him on Allen.

94. He insisted that there was no issue with Reid conducting the investigation.

95. Jackson learned from sources that Roechner was upset with and wanted to get even with Jackson.

### Roechner Sees His Opportunity to Get Even with Jackson

96. Roechner saw his opportunity to get even with Jackson on March 9, 2019.

97. That evening, Crest Hill police received a domestic call involving Jackson, the facts of which remain disputed.

98. On March 9, 2019, Jackson and Stacy Ward each consumed alcoholic beverages at Dar's Bar in Joliet.

99. Jackson was not on duty that evening.

100. After returning to Ms. Ward's residence, they had a verbal argument about Ms. Ward's desire to continue consuming alcohol and spending money that evening.

101. Jackson departed from Ms. Ward's residence.

102. Crest Hill received the domestic call.

103. The alleged incident took place in Crest Hill.

104. Crest Hill police had the resources and experience necessary to investigate a routine domestic incident.

105. Despite this fact, the Joliet P.D. was alerted to the call and to Jackson's alleged involvement.

106. Roechner sent Lt. Rosado and Deputy Chief Perona to the Crest Hill police department.

107. Roechner later stated to officers during roll call that he sent his senior officers to Crest Hill in order to "make sure Crest Hill didn't screw up the charges" against Jackson.

**Rosado Tells Jackson That Roechner Has Ordered Him
To Report to Joliet P.D. Or He'll Be In Violation of a Direct Order;
When Jackson Arrives at the Joliet Station He is Arrested**

108.     Rosado called Jackson and stated that he was at the Crest Hill police station helping Crest Hill investigate Jackson's alleged conduct. Rosado asked Jackson to speak to Opiola.

109.     Jackson told Opiola during their phone call, in part, that a surveillance video recorded at Zobel's Tavern contained exculpatory evidence showing that Ms. Ward had preexisting injuries resulting from a fall at Zobel's.

110.     After Joliet police became involved, Opiola and Crest Hill Police Chief Clark spoke by phone and decided to determine that there was probable cause to arrest Jackson.

111.     A Crest Hill patrolman then requested a warrant for Jackson's arrest with a $20,000.00 bond. In Jackson's experience, most misdemeanor domestic battery warrants are $5,000.00 to $10,000.00.

112.     Around 4:00 a.m. on March 10, 2019, Rosado called Jackson. Rosado stated that Roechner and Perona had ordered Jackson to report to the Joliet Police Department within 15 minutes or that Jackson would be in violation of a direct order. If a police officer violates a direct order, he or she can be terminated. Jackson's home is located more than 15 minutes from the Joliet Police Department.

113.     Jackson reported to the Joliet Police Department. He was placed on administrative orders and placed under arrest.

114.     As a result of being placed on administrative orders, Jackson was stripped of his police powers and firearm.

115.     Jackson was charged with two counts of domestic battery.

116.     Jackson later became aware that the only reason he was arrested was because the Joliet Police Department wanted him arrested.

## Crest Hill Allows Rosado And the Joliet P.D. To Run
## The One-Sided Criminal Investigation

117.     Sgt. Opiola and the Crest Hill Police Department allowed Rosado to take a lead role in handling the charge and the investigation into Jackson's alleged conduct.

118.     Opiola allowed Rosado to interview Ms. Ward and her son, a non-occurrence witness.

119.     Rosado and the Joliet P.D.'s involvement in the charges and investigation resulted in a one-sided police report, which failed to mention exculpatory evidence.

120.     Rosado also conducted the Joliet P.D. internal investigation into Jackson's alleged conduct.

121.     An unsigned draft of the Internal Affairs Investigation Report indicates that Rosado drafted the Joliet P.D.'s Internal Affairs report.

122.     Rosado intentionally, negligently or recklessly failed to include exculpatory evidence in the Internal Affairs report.

## Roechner and his Administration Cause
## Exculpatory Evidence To Be Lost Or Destroyed And Violate
## Jackson's Constitutional Rights In The Criminal Proceeding

123.     Attorney and retired Will County Judge Carla Policandriotes represented Jackson in defending the domestic battery charges.

124.     Jackson's agent attempted to obtain a copy of the surveillance recording from Zobel's Tavern.

125.     Frank Baloy owns or is an owner of Zobel's Tavern.

126.     At the direction of the City of Joliet police department, Baloy told Jackson's agent that Baloy would only release the video to Jackson if Baloy was served with a subpoena or a "release form."

127.     Jackson caused a subpoena to be served on Zobel's for the surveillance recording.

128.     In response to Jackson's subpoena, Baloy advised Attorney Policandriotes that he had looked at the video and inquired as to the necessity of its contents and the exact timeframe for the copying.

129.     Three days later, Baloy advised Attorney Policandriotes that the video had looped in time and was no longer available for the defense.

130.     On information and belief, Baloy is related to Joliet Police Supervisor Lindsey Heavener.

131.     The Joliet and Crest Hill and Joliet Police Departments intentionally, negligently or recklessly failed to protect and preserve exculpatory evidence in connection with Jackson's criminal investigation.

**Roechner and his Administration Refuse**
**To Turn Over Exculpatory Evidence**
**To Jackson's Defense Attorney**

132.     Jackson's defense attorney requested that the State produce Rosado's interview of Ms. Ward, a memorandum of Jackson's alleged statements to Rosado, the Zobel's Tavern recording, and a case file that Rosado kept on Jackson, among other things.

133.     The Joliet P.D. refused to turn over exculpatory evidence to the Defense.

134.     Attorney Policandriotes was forced to file a motion in Jackson's Will County case outlining the unconstitutional aspects of the police department's handling of the case, including its failure to protect and preserve the Zobel's surveillance recording.

135.    The domestic charges were ultimately dismissed.

136.    However, Roechner, his administration and the Crest Hill Police Department had damaged Jackson's personal and professional reputation in the Department and in the community and violated Jackson's Constitutional rights in numerous instances.

137.    For example, *The Joliet Patch* and *The Herald News* published portions of the one-sided police report.

138.    In addition, in approximately March 2019, Roechner and Perona, both during roll calls and at an Investigation Division meeting, made biased statements to Jackson's fellow officers that imputed Jackson was guilty of a crime.

### Jackson Again Reports Roechner and His Administration's Bias Against Members of the BPOA To The City

139.    On approximately March 21, 2019, Jackson gave a memo to Joliet Interim City Manager Shanahan entitled "Joliet Police Chief Al Roechner creating a hostile work environment."

140.    Jackson detailed the biased comments by Roechner and Perona during roll call and at the Investigation Division meeting and asserted his right to a fair investigation.

141.    Jackson also warned Shanahan that Roechner had made up his mind and couldn't be non-biased in cases involving Jackson or the Joliet BPOA.

142.    On information and belief, Shanahan began conducting an investigation into certain issues in the Joliet Police Department during his time as Interim City Manager.

143.    However, according to media reports, Shanahan was ousted from his position as Interim City Manager by five members of the Joliet City Council who were carrying out the wishes of sergeant members of the Joliet Police Supervisors Association, a group closely aligned with Roechner.

**Roechner And His Administration**
**Continue To Target And Attempt to Silence Jackson**

144.    On July 18, 2019, Jackson filed his charge of discrimination with the EEOC.

145.    Roechner and the Joliet P.D. continue to target Jackson.

146.    In September 2019, Jackson requested that Roechner sign a housing application form.

147.    Roechner refused to sign the form. Despite the fact that Jackson was returned to duty and the criminal charges were dismissed, Roechner claimed Jackson was not a member of the department in good standing so long as the administrative matter remained pending.

148.    The NBPA conference was held on August 18-24, 2019. For the first time in approximately 20 years, the Joliet P.D. refused to pay the tuition for a member of the BPOA to attend. Roechner claimed that the Department's funds were depleted.

149.    Jackson has exhausted his administrative remedies and his filing of this action is timely.

**COUNT I**
**VIOLATION OF 42 U.S.C. § 1983 AND**
**THE FIRST, FOURTH AND FOURTEENTH AMENDMENTS**
**TO THE UNITED STATES CONSTITUTION**
**AGAINST ALL DEFENDANTS**

150.    Jackson realleges and incorporates by reference paragraphs 1 through 149 above.

151.    Jackson is a public employee.

152.    Jackson exercised his First Amendment rights, including as follows:

   a.    Jackson drafted a letter to NBPA chair Pruitt and circulated it to BPOA board members for review and comment;

    b.   Jackson spoke to Interim City Manager Marty Shanahan regarding the BPOA's request that Shanahan consider a diversity candidate for an opening in the department;

    c.   Jackson spoke to Roechner and Perona regarding the BPOA's concerns about the reasons for the termination of its longtime member, Lionel Allen;

    d.   Jackson called a meeting on behalf of the BPOA to discuss the reasons for Roechner's recommendation that Allen be terminated and the process involved in his reaching that decision;

    e.   Jackson issued a statement to *The Times Weekly* on behalf of the BPOA;

    f.   Jackson wrote a memo to Joliet Interim City Manager Shanahan, alerting him to Jackson's belief that Roechner had made up his mind and could not be non-biased in cases involving Jackson or the BPOA; and

    g.   Jackson associated with the BPOA and has been its president since 2018.

153.    Jackson's speech related to matters of public concern which have long been established under First Amendment caselaw, including with regard to incidents of racial discrimination, abuses of power by the Roechner administration and the due process rights of minority officers associated with the BPOA.

154.    Jackson suffered deprivations likely to deter free speech when Roechner, Rosado, Perona, Clark, and Opiola ("the Officers") engaged in the acts set forth in paragraphs 1 through 149 above.

155.    For example, the Officers retaliated against Jackson for his association with the BPOA and for his actions set forth in paragraphs 138(a)-(g).

156.     Jackson's protected speech was a motivating factor in Defendants' actions and, but for his protected speech, the Officers would not have taken the actions set forth above.

157.     In addition, the Officers violated Jackson's Fourth Amendment right to be free from unlawful search and seizure when they engaged in the acts set forth in paragraphs 1 through 149 above.

158.     The Officers violated Jackson's due process rights under the Fourteenth Amendment when they engaged in the acts set forth in paragraphs 1 through 149 above.

159.     The Officers violated Jackson's equal protection rights under the Fourteenth Amendment when they discriminated against him on the basis of his race.

160.     The Officers were responsible for the deprivations of Jackson's constitutional rights. They personally caused the constitutional deprivations, participated in the deprivations, knew about them and facilitated them, approved them, condoned them and/or turned a blind eye to the deprivations of Jackson's constitutional rights.

161.     The Officers acted under color of state law when they violated Jackson's constitutional rights.

162.     Defendants City of Joliet and Joliet Police Department are liable for the Officers' violations of Jackson's constitutional rights.

163.     Management level officers in the Joliet Police Department and its Police Chief have engaged in a widespread practice of discrimination and retaliation against black officers that is so permanent and well settled as to constitute a custom or usage with the force of law.

164.     The City and Joliet Police Department vest the police chief with final policymaking authority, including the discretion to interpret and implement the Joliet Police Department's General Orders.

20

165.     The application and enforcement of express policies of the Joliet Police Department caused Jackson's and other BPOA members' constitutional deprivations, including application of the following General Orders:

Joliet Police Department General Order 7-1 Code of Conduct, Subsection:

1.1B Conduct unbecoming of Department members shall not be tolerated. This shall include any conduct which adversely affects the morale, operations, or efficiency of the department or any conduct which has a tendency to adversely affect, lower, or destroy public respect and confidence in the department, or any department member. Conduct unbecoming also includes any act or conduct which brings disrepute or discredit upon the department, or the department member. Department members shall conduct themselves at all times, both on and off duty, in such a manner so as to reflect most favorably on the department.

1.5E Members shall not knowingly make false statements or intentionally misrepresent facts.

1.6E Members shall not make malicious, harassing, or frivolous complaints against fellow members of the department.

.        .        .

Joliet Police Department General Order 8-4 Public Information, Subsection,

2.3A Official response to criticism of the Department, comments critical of the Department, or another department, agency, institution, or public official will be made only by the Chief of Police or his designee

And

4.1 No member will make a public statement concerning plans, or affairs of the administration of the Department, unless authorized by the Chief or a Division Deputy Chief.

4.2 Members may only speak with the media about an incident by authority of this directive or by appropriate supervisory consent. (Emphasis added).

166.     Roechner and his administration systematically use the Department's General Orders to violate black officers' constitutional rights and attempt to silence their First Amendment protected speech.

**WHEREFORE**, Plaintiff David C. Jackson prays that the Court enter judgment in his favor and against Defendants the City of Joliet, Joliet Police Department, Roechner, Rosado, Perona, Clark, and Opiola and respectfully requests that the Court:

A.     Declare Defendants' conduct to violate the rights guaranteed to David Jackson under 42 U.S.C. §1983;

B.     Grant a permanent injunction restraining Defendants the City of Joliet, the Joliet Police Department, its officers, employees and all persons in active concert or participation with it, from engaging in any practice which unlawfully discriminates on the basis of race or violates the rights afforded to its employees by the United States Constitution;

C.     Order Defendants to make David Jackson whole by providing the affirmative relief necessary to eradicate the effects of Defendants' unlawful practices;

D.     As against all defendants, jointly and severally, grant David Jackson compensatory, consequential and nominal damages and damages for emotional pain, distress, and suffering and mental anguish in an amount to be determined at trial;

E.     As against Defendants Roechner, Perona, Rosado, Opiola, and Clark individually, grant David Jackson punitive damages in an amount to be determined at trial;

F.     Grant David Jackson such equitable and injunctive relief that the Court may deem appropriate;

G.     Grant David Jackson his attorneys' fees, costs, pre-judgment and post-judgment interest and disbursements; and

H.     Grant David Jackson such further relief as the Court deems necessary and proper.

**COUNT II**
**VIOLATION OF 42 U.S.C. § 1985**
**CONSPIRACY TO VIOLATE CIVIL RIGHTS**
**AGAINST DEFENDANTS CITY OF JOLIET,**
**JOLIET POLICE DEPARTMENT, BALOY, ROECHNER,**
**ROSADO, PERONA, OPIOLA AND CLARK**

167.     Jackson realleges and incorporates by reference paragraphs 1 through 149 above.

168.     The Crest Hill police department notified the Joliet Police Department about the domestic call that it had received on March 9, 2019 involving Jackson.

169.     On March 9, 2019, Sgt. Opiola sought and secured Crest Hill Police Chief Clark's green light to issue an arrest warrant for Jackson.

170.     Jackson later learned that the only reason he was arrested was because the Joliet Police Department wanted him arrested.

171.     Jackson was arrested on or about March 10, 2019.

172.     One or more officers in the Joliet Police Department reached an agreement with officers in the Crest Hill police department on or about March 9, 2019 to arrest Jackson.

173.     One or more officers in the Joliet Police Department and Defendant Baloy reached one or more agreements during the time period between approximately March 9, 2019 and March 25, 2019 to deprive Jackson of his constitutional rights.

174.     Defendants Roechner, Rosado and Perona were aware of the charges against Jackson and one or more of the foregoing defendants participated in the criminal investigation. In addition, Rosado took a lead role in the administrative investigation regarding Jackson.

175.     The co-conspirators agreed that Baloy would obstruct Jackson's attempts to obtain a copy of the Zobel's Tavern surveillance recording which Jackson had earlier advised officers contained exculpatory evidence.

23

176.     The co-conspirators agreed to alter, erase, destroy or otherwise prevent Jackson, then charged with domestic misdemeanor battery, from obtaining a copy of the Zobel's Tavern surveillance recording,

177.     Baloy was a willful participant in the joint activity with the Officers.

178.     On or about March 15, 2019, Jackson's agent visited Zobel's Tavern and asked Baloy for a copy of the recording.

179.     Baloy refused to turn over the recording and stated that the Joliet Police told him that if someone "came around looking for that video, that I should tell them to give me a subpoena and a release form."

180.     Baloy was on notice of the charges against Jackson and the fact that Jackson had advised officers that the video contained exculpatory evidence since at least March 15, 2019, if not earlier.

181.     On or about March 25, 2019, Baloy admitted to Jackson's criminal defense attorney that he had looked at the video recording.

182.     Later that same day, Baloy advised Jackson's counsel that the video had looped in time and was no longer available for the defense.

183.     As a result of one or more Joliet police officers' agreement(s) with Baloy, Jackson was unable to obtain a copy of the Zobel's Tavern surveillance recording in the criminal proceeding, which had been lost or destroyed.

**WHEREFORE**, Plaintiff David C. Jackson prays that the Court enter judgment in his favor and against Defendants Joliet Police Department, City of Joliet, Roechner, Rosado, Perona, Opiola, Clark and Baloy and respectfully requests that the Court:

A.  Declare Defendants' conduct to violate the rights guaranteed to David Jackson under 42 U.S.C. §1985;

B.  Grant a permanent injunction restraining Defendants the City of Joliet, the Joliet Police Department, its officers, employees and all persons in active concert or participation with it, from engaging in any practice which unlawfully discriminates on the basis of race or violates the rights afforded to its employees by the United States Constitution;

C.  Order Defendants to make David Jackson whole by providing the affirmative relief necessary to eradicate the effects of Defendants' unlawful practices;

D.  As against all defendants, jointly and severally, grant David Jackson compensatory, consequential and nominal damages and damages for emotional pain, distress, and suffering and mental anguish in an amount to be determined at trial;

E.  As against defendants Baloy, Roechner, Rosado, Perona, Opiola and Clark grant David Jackson punitive damages in an amount to be determined at trial;

F.  Grant David Jackson such equitable and injunctive relief that the Court may deem appropriate;

G.  Grant David Jackson his attorneys' fees, costs, pre-judgment and post-judgment interest and disbursements;

H.  Grant David Jackson such further relief as the Court deems necessary and proper.

## COUNT III
## VIOLATIONS OF 42 U.S.C. § 2000(e) *et seq.* (TITLE VII) AND 775 ILCS 5/2-101 *et seq.* (THE ILLINOIS HUMAN RIGHTS ACT)
## AGAINST DEFENDANTS CITY OF JOLIET AND JOLIET POLICE DEPARTMENT
## (DISPARATE TREATMENT/ RETALIATION/ DISPARATE IMPACT)

184.     Jackson realleges and incorporates by reference paragraphs 1 through 149 above.

185.     Jackson is a member of a protected class because he is black.

186.     Jackson has, at all relevant times, met or exceeded the Joliet Police Department's and/or the City of Joliet's legitimate job expectations.

187.     Jackson engaged in statutorily protected expression, including by opposing discrimination within the Joliet P.D.

188.     Defendants took adverse actions against Jackson, including as follows:

   a.     Defendants subjected Jackson to an objectively and subjectively offensive workplace;

   b.     Defendants subjected Jackson to harassment by Roechner and his administration on the basis of Jackson's race. The discriminatory and harassing conduct was severe and pervasive;

   c.     Defendants subjected Jackson to different and less favorable terms and conditions of employment than white employees;

   d.     Defendants issued frivolous internal affairs charges to Jackson, which held Jackson back in his career and for which he received a one-day suspension; and

   e.     Defendants took other adverse actions as set forth in paragraphs 1 through 149 above.

189.     Defendants took the above adverse actions against Jackson because he is black.

190.     Defendants took the above adverse actions against Jackson because he engaged in statutorily protected activity.

191.     Defendants treated similarly situated white officers and officers who did not engage in statutorily protected activity more favorably than they treated Jackson.

192.     The Joliet P.D., through Roechner and his Administration, systematically use the Joliet P.D. General Orders to silence BPOA members and officers who complain about race discrimination, causing a disparate impact on the basis of race.

193.     The Joliet P.D.'s application of the General Orders is neither job-related nor is it consistent with business necessity.

194.     The Joliet Police Department and City of Joliet knew or should have known about Roechner and his administration's discriminatory conduct.

195.     The Joliet Police Department and City of Joliet failed to take remedial action for Roechner and his administration's discriminatory conduct toward Jackson.

196.     Defendants discriminatory conduct was intentional.

197.     Defendants' conduct was done with malice or reckless indifference to Jackson's rights under federal and Illinois law.

198.     Jackson was damaged by Defendants' discriminatory conduct in violation of Title VII and the Illinois Human Rights Act. His damages include, but are not limited to, damage to his career, damage to his personal and professional reputation, inconvenience, emotional and psychological harm and other harm.

**WHEREFORE**, Plaintiff David C. Jackson prays that the Court enter judgment in his favor and against Defendants the City of Joliet and Joliet Police Department and respectfully requests that the Court:

A.  Declare Defendants' conduct to violate the rights guaranteed to David Jackson under 42 U.S.C. §2000(e) and 775 ILCS 5/2-101;

B.  Grant a permanent injunction restraining Defendants, their officers and employees and all persons in active concert or participation with Defendants from engaging in any employment practice which unlawfully discriminates on the basis of race;

C.  Order Defendants to make David Jackson whole by providing the affirmative relief necessary to eradicate the effects of Defendants' unlawful practices;

D.  Grant David Jackson consequential, compensatory, nominal and any other damages, including backpay, additional backpay to account for the negative tax consequences of a lump-sum payment and damages for emotional pain, distress, and suffering and mental anguish, in an amount to be determined at trial;

E.  Grant David Jackson such equitable and injunctive relief that the Court may deem appropriate;

F.  Grant David Jackson his attorneys' fees, costs, pre-judgment and post-judgment interest and disbursements;

G.  Grant David Jackson such further relief as the Court deems necessary and proper.

**COUNT IV**
**VIOLATION OF 42 U.S.C. § 1981**
**AGAINST DEFENDANTS CITY OF JOLIET, JOLIET POLICE DEPARTMENT**
**AND OFFICERS ROECHNER, ROSADO, PERONA, CLARK AND OPIOLA**
**DISCRIMINATION IN VIOLATION OF  § 1981 AND RETALIATION**

199.  Jackson realleges and incorporates by reference paragraphs 1 through 149  above.

200.  Jackson is a member of a racial or ethnic minority.

201.  Jackson engaged in legally protected activity.

202.    Defendants intended to discriminate against Jackson because of his race or ethnicity.

203.    Jackson suffered one or more adverse employment actions.

204.    The discrimination deprived Jackson of one or more rights enumerated in section 1981.

205.    There is a causal connection between Jackson's legally protected activity and the adverse actions to which Defendants subjected him.

206.    Defendants Roechner, Rosado, Perona, Opiola and Clark are individually responsible for the deprivations of Jackson's federal rights. They personally caused the deprivations, participated in the deprivations, knew about them and facilitated them, approved them, condoned them or turned a blind eye to the deprivations.

**WHEREFORE**, Plaintiff David C. Jackson prays that the Court enter judgment in his favor and against Defendants and respectfully requests that the Court:

A. Declare Defendants' conduct to violate the rights guaranteed to David Jackson under 42 U.S.C. § 1981;

B. Grant a permanent injunction restraining Defendants, their officers and employees and all persons in active concert or participation with Defendants from engaging in any employment practice which unlawfully discriminates on the basis of race;

C. Order Defendants to make David Jackson whole by providing the affirmative relief necessary to eradicate the effects of Defendants' unlawful practices;

D. Grant David Jackson consequential, compensatory, nominal and any other damages, including backpay, additional backpay to account for the negative tax consequences of a lump-

sum payment and damages for emotional pain, distress, and suffering and mental anguish, in an amount to be determined at trial, against all Defendants;

E.  Grant David Jackson punitive damages against Defendants Roechner, Perona, Rosado, Opiola and Clark;

E.  Grant David Jackson such equitable and injunctive relief that the Court may deem appropriate;

F.  Grant David Jackson his attorneys' fees, costs, pre-judgment and post-judgment interest and disbursements; and

G.  Grant David Jackson such further relief as the Court deems necessary and proper.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AGAINST ALL DEFENDANTS

207.    Jackson realleges and incorporates by reference paragraphs 1- 149 above.

208.    Defendants subjected Jackson to extreme and outrageous conduct.

209.    Defendants intended that their conduct inflict severe emotional distress on Jackson or recklessly or consciously disregarded the high probability that their conduct would cause Jackson severe emotional distress.

210.    Defendants' conduct caused Jackson severe or extreme emotional distress.

**WHEREFORE**, Plaintiff David Jackson prays that the Court enter judgment in his favor and against all Defendants, jointly and severally, including for compensatory damages and punitive damages in an amount to be determined at trial, and to grant other such relief as permitted by law.

## **DEMAND FOR JURY TRIAL**

211.      Plaintiff David C. Jackson demands trial by jury on all counts and issues.

Respectfully Submitted,

David C. Jackson

/s/     Stacey Vucko
STACEY B. VUCKO
One of the Attorneys for Plaintiff

/s/    Joseph Vucko
JOSEPH W. VUCKO
One of the Attorneys for Plaintiff

Dated: November 4, 2019

STACEY B. VUCKO
JOSEPH W. VUCKO
VUCKO LAW LLP
2208 Midwest Rd., Suite 104
Oak Brook, IL 60523
312-522-2517
svucko@vuckolaw.com
jvucko@vuckolaw.com