# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DAVID C. JACKSON,

      Plaintiff,

      v.

CITY OF JOLIET; AL ROECHNER; JOSEPH
ROSADO; JOHN PERONA; ED CLARK;
JASON OPIOLA; and FRANK BALOY,

      Defendants.

No. 19 C 7284

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

David Jackson, a Joliet police detective, alleges that certain Joliet and Crest Hill, Illinois police officers, and one private citizen named Frank Baloy, conspired to violate his civil rights by retaliating and discriminating against him based on his race in violation of Title VII and various other federal and state law. In three motions by Joliet, Crest Hill, and Baloy, some of the defendants have moved to dismiss some of the claims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). R. 27; R. 36; R. 40. The Joliet motion is denied and the Crest Hill and Baloy's motions are granted.

## Legal Standard

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of

the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## Background

### A.  Jackson Experiences Racism in the Joliet Police Department

Jackson is a Joliet police officer who is Black. R. 24 ¶ 24. He became a Joliet police officer in 1995 and was promoted to detective five years later. *Id.* ¶¶ 24-25.

Jackson alleges that the Joliet Police Department has had a racist culture for many years. *Id.* ¶¶ 17-23. Specifically, Jackson alleges that defendant Officers Marc Reid and Al Roechner took adverse actions against him based on his race. *Id.* ¶¶ 24-32.

In 2007, defendant Reid was Jackson's supervisor. Jackson alleges that Reid harassed him because Jackson is Black. Jackson reported Reid's conduct but was told that Reid would not be investigated. *Id.*

In 2009, defendant Roechner and another Joliet officer (identified in the complaint only as "Cardwell") gave Jackson a negative performance evaluation. *Id.* ¶ 34. Jackson formally objected to the evaluation claiming it was based on his race. *Id.* ¶ 35. In 2012, the Department determined that Jackson had been held to "a less favorable standard with regard to the 2009 evaluation." *Id.* ¶ 36.

Jackson also alleges that he has been subject to "unfounded internal affairs investigation complaints" that "have held [him] back in his career and negatively impacted his earning potential." *Id.* ¶ 37. Jackson's complaint does not describe these investigations. The only negative affect on his career Jackson alleges is that he was denied a detective position in 2013. *Id.* ¶ 42.

### B. The Allen Lawsuit and Investigation

In 2018, defendant Roechner became the Chief of the Joliet Police Department, and defendant Reid was promoted to Deputy Chief. *Id.* ¶¶ 47, 48. That same year Jackson was elected President of the Joliet Black Police Officers Association ("BPOA"). *Id.* ¶ 49.

BPOA member Lionel Allen sued Joliet, defendant Reid, and another officer for race discrimination and retaliation. *Id.* ¶ 53. Despite Reid being a defendant in Allen's case, Roechner permitted Reid to participate in an internal investigation of Allen. *Id.* ¶ 91. Around December 2018, in his role as BPOA president, Jackson

3

prepared a letter to the National Black Police Association ("NBPA") expressing concern about Allen's case and defendant Roechner's poor track record on issues of race in the Department. *Id.* ¶¶ 56-58.

The next month, January 2019, Roechner recommended that Allen be fired. *Id.* ¶ 61. Jackson and Roechner met to discuss this recommendation. *Id.* ¶ 63. Defendant John Perona, who is another Joliet Deputy Chief, was also present at the meeting. *Id.* Roechner told Jackson that he had seen a copy of Jackson's letter to the NBPA and he criticized Jackson for drafting it. *Id.* ¶ 65. Roechner also expressed anger because Jackson had recommended to the Joliet City Manager a "diversity candidate" for an open deputy chief position. *Id.* Jackson alleges that Roechner told him he did not like the candidate and that he "did not care about diversity." *Id.*

About a month later, on February 1, 2019, Jackson made a statement to a newspaper criticizing Roechner's recommendation that Allen be fired and explaining that the BPOA wanted a "fair and non-biased hearing" for Allen. *Id.* ¶¶ 75-78. Defendant Lieutenant Joseph Rosado, and non-party Sergeant Rouse, filed internal affairs charges against Jackson for this statement to the newspaper, accusing him of making a public statement without authorization in violation of the Department's General Order 8-4. *Id.* ¶ 79. Jackson alleges that Rosado told him that Roechner and a deputy chief ordered him to file the charges. *Id.* ¶ 81. Jackson was suspended for one day based on the charges. *Id.* ¶ 83.

By contrast, Jackson alleges that a white officer faced no discipline for similar actions. *Id.* ¶ 84. Jackson claims that non-party Sergeant Cardwell, who is white,

sent an email to the Joliet Board of Fire and Police Commissioners accusing them of neglect and questioning their integrity, and sent a copy of the email to a newspaper. *Id.* ¶ 84. Cardwell also argued with the Commissioners at a public meeting, and his statements were reported in the media. *Id.* ¶ 85. Then Cardwell made a statement to the media accusing Joliet's mayor of trying to make the Police Department his "political playground." *Id.* ¶ 86. Jackson alleges that Cardwell was not investigated or disciplined for any of these public statements. *Id.*

Later in February, Jackson called a public meeting on behalf of the BPOA to discuss Allen's treatment. *Id.* ¶ 88. Defendants Roechner, Perona, and Reid were in attendance, among a number of other officers and citizens. *Id.* ¶ 89. Jackson again criticized Roechner's recommendation that Allen be fired and questioned whether it was appropriate for Reid to participate in Allen's investigation. *Id.* ¶ 90-91. Jackson alleges that Roechner berated him at the meeting for questioning him and the integrity of the investigation. *Id.* ¶ 92-93.

### C. Jackson's Arrest

A little more than a month later, on the night of March 9, 2019, Jackson went on a date in Crest Hill, Illinois. *Id.* ¶ 96-97. At some point that night, Jackson's date called the Crest Hill police department to accuse Jackson of battery. *Id.* ¶¶ 96-101. Jackson alleges that Roechner told other Joliet officers that he sent defendant Rosado to the Crest Hill Police Department to "make sure Crest Hill didn't screw up the charges." *Id.* ¶ 106.

That night, after Jackson had apparently returned home, Rosado called him from the Crest Hill police station to have Jackson speak to defendant Crest Hill Officer Jason Opiola. *Id.* ¶ 107. Jackson alleges he told Opiola that surveillance video from a bar owned by defendant Frank Baloy would show that his date's injuries were caused when she fell at Baloy's bar. *Id.* ¶¶ 108, 124. Jackson alleges that Officer Opiola and another Crest Hill Officer, defendant Ed Clark, determined there was probable cause to arrest Jackson, and obtained a warrant and a $20,000 bond. *Id.* ¶¶ 109-10. Jackson alleges that $20,000 is two to four times greater than the normal bond for the level of charges he faced. *Id.* ¶ 110.

At 4 a.m. on March 10, Rosado again called Jackson to tell him that Roechner ordered Jackson to report to the Joliet Police Station immediately. *Id.* ¶ 111. When he arrived, Jackson was arrested and charged with two counts of misdemeanor domestic battery and placed on administrative duty. *Id.* ¶ 112-14.

Jackson alleges that Opiola and Clark permitted Rosado to participate in Crest Hill's investigation of the charges against Jackson, including interviewing Jackson's accuser and her son. *Id.* ¶¶ 116-19. Rosado also conducted Joliet's internal investigation. *Id.* ¶ 120. Rosado did not review the surveillance video from Baloy's bar. *Id.* ¶ 121.

Jackson's attorney attempted to acquire the video, but Baloy refused to provide it without a subpoena. *Id.* ¶¶ 123-25. Jackson alleges that Baloy did so at the behest of the Joliet Police Department. *Id.* ¶ 125. Baloy is related to a Joliet police officer. *Id.* ¶ 129. By the time Jackson obtained a subpoena, the surveillance video had

"looped," meaning that it had recorded more recent events over the older events Jackson was interested in viewing. *Id.* ¶ 128. The charges against Jackson were ultimately dismissed. *Id.* ¶ 134.

### D.    Jackson's Claims

Jackson filed an EEOC charge against Defendants on July 18, 2019. *Id.* ¶ 143. He alleges that since he filed the EEOC charge, Joliet has taken the following actions against him: (1) stating that he is not in "good standing," which has prevented Jackson from obtaining certain housing; (2) refusing to pay for a BPOA member to attend the NBPA national conference, as has been customary; (3) filing "frivolous" internal affairs charges against Jackson on December 30, 2019 and January 9, 2020; (4) maintaining "an unlawful 'no contact' order against Jackson"; and (5) claiming that Jackson is under investigation. *Id.* ¶ 148.

Jackson filed this lawsuit on November 4, 2019. He brings federal discrimination and retaliation claims, and state law claims regarding the alleged impropriety of his arrest and prosecution. He makes his claims via seven counts in his complaint:

> *Count I* claims violations of the First, Fourth, Fifth, and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983, against all Defendants except Baloy;
>
> *Count II* claims a conspiracy to violate Jackson's civil rights under 42 U.S.C. § 1985, against all Defendants, including Baloy;
>
> *Count III* claims race discrimination and retaliation in employment in violation of Title VII, 42 U.S.C. § 2000, against the City of Joliet;
>
> *Count IV* claims violation of 42 U.S.C. § 1981 against all Defendants except the City of Joliet and Baloy;

*Count V* claims intentional infliction of emotional distress against all Defendants;

*Count VI* claims false arrest and imprisonment against all Defendants except Baloy; and,

*Count VII* claims malicious prosecution against all Defendants except Baloy.

## Analysis

Three motions to dismiss have been filed: (1) a motion by the City of Joliet and the individual Joliet officers, R. 40; (2) a motion by Crest Hill Officers Opiola and Clark, R. 36; and (3) a motion by Baloy, R. 27. The heart of Jackson's complaint, his federal claims against Joliet and Roechner, are not at issue because Joliet and Roechner have not moved to dismiss them.[1]

## I.  Joliet's Motion

Joliet's motion makes the following arguments: (1) the civil rights claims (Count I) against Rosado and Perona should be dismissed based on qualified immunity; (2) the Section 1981 claim (Count IV) against Rosado and Perona should be dismissed for failure to allege an adverse action; (3) the intentional infliction of emotional distress claim (Count V) against Perona should be dismissed because Perona's conduct was not extreme and outrageous; (4) the false arrest claim (Count VI) should be dismissed because the Joliet defendants were not responsible for Jackon's arrest; and (5) the malicious prosecution claim (Count VII) should be

---

[1] Joliet initially argued that Jackson had failed to administratively exhaust his Title VII claims but withdrew that argument after Jackson attached the EEOC Right to Sue Letter to his opposition brief. *See* R. 55 at 9.

dismissed because the Joliet defendants did not play a substantial role in Jackson's prosecution.

### A.    Qualified Immunity

To establish qualified immunity, a defendant must show that his conduct did not violate a clearly established constitutional right. *See Lovett v. Herbert*, 907 F.3d 986, 991 (7th Cir. 2018). Rosado and Perona argue that there is no clearly established constitutional right to be free from a retaliatory or improper investigation. Although neither the Supreme Court nor the Seventh Circuit have addressed this issue, several Circuits have found that a retaliatory investigation is actionable under the First Amendment. *See Hernandez v. Cook Cty. Sheriff's Office*, 2017 WL 4535982, at *7 (N.D. Ill. Sept. 25, 2017) (citing cases). Moreover, Jackson was not merely investigated. He was arrested, allegedly without probable cause. Defendants have not argued that a retaliatory arrest without probable does not violate a clearly established constitutional right. They also have not argued that Jackson failed to plausibly allege that his arrest lacked probable cause.

Furthermore, even if a retaliatory arrest does not violate a clearly established constitutional right, Jackson claims that Defendants also acted with racially discriminatory motivation. He claims that he was suspended, and later arrested, not only because he spoke out in his role as BPOA president against what he perceived to be racially motivated actions against Officer Allen *but also* because he (Jackson) is Black. He claims that Joliet and Roechner have taken numerous actions against him not only because he filed an EEOC charge regarding his suspension and arrest *but*

*also* because he is Black. Suspending and arresting a person because that person is Black is a clear violation of the Fourteenth Amendment. Rosado and Perona do not argue otherwise.

Perona also argues that the specific allegations against him do not implicate a constitutional right. Jackson makes the following allegations against Perona: (1) he attended a meeting with Roechner in order to intimidate Jackson; (2) with Roechner, he jointly ordered Jackson to return to the Joliet Police Station where he was arrested; and (3) he commented at roll call meetings that Jackson was "guilty of a crime." Of course, Jackson does not claim that these individual actions violated his rights. Rather, he makes these allegations to show Perona's participation in the conspiracy to suspend and arrest him in retaliation for his public comments and because he is Black. It maybe that discovery will show that Perona did not sufficiently participate in the events to establish causation and liability, either directly or in conspiracy with the other defendants. But Perona does not argue in his motion that Jackson has failed to plausibility allege Perona's participation in the otherwise well pled constitutional violations.

Therefore, Perona's and Rosado's motion to dismiss based on qualified immunity is denied.

### B.    Section 1981

"To prevail on either a discrimination or retaliation claim under Section 1981 in the employment context, a plaintiff must allege that her employer subjected her to adverse actions." *Adam v. Obama for America*, 210 F. Supp. 3d 979, 988 (N.D. Ill.

2016). Perona and Rosado argue that their "alleged actions do not qualify as adverse job actions." This argument misses the point. Jackson's allegations about Perona's and Rosado's "actions" are not the "*adverse* actions" themselves that he alleges for purposes of his claims. The adverse actions Jackson alleges are his suspension and arrest, and Joliet's continued statements that he is not in good standing as an officer, which certainly qualify at this stage of the case as "adverse job actions." Jackson's allegation about Perona's and Rosado's conduct are intended to demonstrate that they participated in the conspiracy against him making them liable for the adverse actions he suffered. Therefore, Perona's and Rosado's motion to dismiss the Section 1981 claim is denied.

### C.     Intentional Infliction of Emotional Distress

Under Illinois law, the elements of an intentional infliction of emotional distress claim are: "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen-El v. Cook Cnty. Sheriff's Dep't,* 602 F.3d 852, 864 (7th Cir.2010) (citing *Kolegas v. Heftel Broad. Corp.,* 607 N.E.2d 201, 211 (Ill. 1992)). "To meet the 'extreme and outrageous' standard, the defendants' conduct 'must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.'" *Swearnigen-El,* 602 F.3d at 864 (quoting *Kolegas,* 607 N.E.2d at 211). In determining whether conduct meets the "extreme and outrageous" standard, courts consider three main factors: (1) "the more power or

11

control the defendant has over the plaintiff, the more likely the conduct will be deemed extreme"; (2) "whether the defendant reasonably believed its objective was legitimate"; and (3) "whether the defendant was aware the plaintiff was 'peculiarly susceptible to emotional distress, by reason of some physical or mental peculiarity.'" *Franciski v. Univ. of Chi. Hosp.*, 338 F.3d 765, 769 (7th Cir. 2003) (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 811 (Ill. 1998)). In essence, the Illinois Supreme Court has explained that conduct is of an extreme and outrageous "where recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994).

The Seventh Circuit has held that "typical disagreements or job-related stress caused by the average work environment" are insufficient to support a claim for intentional infliction of emotional distress. *See Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 747 (7th Cir. 2008). But such conduct can be extreme and outrageous when the employer or supervisor knows that there is no legitimate objective for the disciplinary investigation. *See Franciski*, 338 F.3d at 769. In such circumstances, the "extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position which gives him actual or apparent power to damage the plaintiff's interests. The result is something very like extortion." *Milton v. Ill. Bell Tel. Co.*, 427 N.E.2d 829, 832 (Ill. App. Ct. 1st Dist. 1981) (citation omitted). In the employment context, "courts have found extreme and outrageous behavior to exist . . . where the employer clearly abuses the power it holds

12

over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Honaker v. Smith*, 256 F.3d 477, 491 (7th Cir. 2001). Indeed, Illinois courts have held that a "sham" or improperly motivated investigation into, and discipline of, an employee's conduct can be "extreme and outrageous." *See Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 868 (Ill. App. Ct. 1st Dist. 2000); *see also Vickers v. Abbott Labs.*, 719 N.E.2d 1101, 1115 (Ill. App. Ct. 1st Dist. 1999) ("a conspiracy or a systematic effort to remove plaintiff from his managerial position" in the employment context can be extreme and outrageous).

Here, Jackson alleges that Perona participated in a sham investigation of Jackson motivated by racial dissemination and retaliation. Perona argues that when an arrestee brings an IIED claim arising out of his arrest, "there must be more than just a lack of probable cause or some excessive force." R. 55 at 16. But the something "more" here is that Jackson claims his arrest was the product of retaliatory and discriminatory motive. Moreover, Perona's and the other defendants' conduct did not merely expose Jackson to the threat of the loss of his employment; Jackson faced the threat of imprisonment as well. Perona and the defendants surely knew that the threat of imprisonment would cause Jackson severe emotional distress, especially since he is a police officer. Moreover, if Perona's actions were in fact motivated by discrimination and retaliation, causing such distress was likely his goal. Therefore, Perona's motion to dismiss Jackson's claim for intentional infliction of emotional distress is denied.

13

### D.    False Arrest

Joliet argues that Jackson has failed to state a claim for false arrest because "the Joliet Defendants were [not] the individuals who literally restrained Plaintiff, or otherwise directed the Crest Hill Defendants to arrest Plaintiff," and "the Joliet Defendants were [not] the 'sole source' of the domestic violence allegations lodged against Plaintiff that led to his arrest." R. 55 at 18. But Jackson alleges that he was arrested by Joliet police officers, who the Court can plausibly infer were subject to the command of Chief Roechner and Deputy Chief Perona. Furthermore, Jackson has alleged that Roechner and Rosado communicated with Crest Hill police officers and were involved in the decision to seek a warrant for Jackson's arrest. The case Joliet cites to argue that Illinois law requires them to have been the "sole source" of the complaint concerns a false arrest claim made against a "private party." *See Shea v. Winnebago Cty. Sheriff's Office*, 2014 WL 4449605, at *20 (N.D. Ill. Sept. 10, 2014) ("In Illinois, when a plaintiff seeks to hold a private party liable for false imprisonment because the private party provided information to police, the plaintiff must allege that the defendant was the "sole source" of information or allege that the defendant actually "commanded[ed], request[ed], or direct[ed]" authorities to arrest plaintiff."). The Joliet Defendants are not "private parties," but are police officers who participated in Jackson's investigation and arrest. Thus, the "sole source" rule is not relevant here.

Joliet argues that Roechner is entitled to immunity for the false arrest claim under Illinois's Tort Immunity Act because "Roechner's decision to order Plaintiff

14

back to the City Police Station was a discretionary police decision, which is immune from liability." But Jackson does not object merely to being ordered to show up at the Joliet Police Station. He objects to the fact that he was arrested upon arrival, and plausibly claims that Roechner is liable for that arrest, in part because he ordered Jackson to return to the station. Joliet does not, and cannot, argue that Roechner is entitled to immunity for an arrest made with retaliatory and discriminatory intent, lacking probable cause, as Jackson alleges. *See Lonzo v. City of Chicago*, 461 F. Supp. 2d 661, 665 (N.D. Ill. 2006) (Section 2-201 of the Tort Immunity Act "does not protect public employees where their acts were based on 'corrupt or malicious motives.'").

Therefore, Joliet's motion to dismiss Jackson's false arrest claim is denied

### E.     Malicious Prosecution

The first element of a malicious prosecution claim in Illinois is "the commencement or continuance of an original criminal or civil judicial proceeding by the defendant." *Beaman v. Freesmeyer*, 131 N.E.3d 488, 495 (Ill. 2019). "In other words, the relevant inquiry is whether the officer proximately caused the commencement or continuance of the criminal proceeding." *Id.* at 496.

Joliet argues that Jackson fails to allege they caused his prosecution because none of the Joliet Defendants played a "significant role" in it. This argument, however, is based on isolated analysis of each individual defendant's conduct apart from the others. This argument ignores Jackson's claim that Defendants conspired against him making them jointly liable. When Jackson's allegation against all Defendants are taken as whole, the plausibly of Jackson's claim is apparent. He

15

plausibly alleges that the Joliet Defendants had animosity towards him because of his criticism of the Department and because he is Black. He also plausibly alleges that he was investigated and arrested without probable cause. And he plausibly alleges that the Joliet Defendants immediately sought involvement in the investigation and were granted authority to conduct it. From these allegations, the Court can infer that Crest Hill sought an arrest warrant for Jackson at the Joliet Defendants' behest. And the Joliet Defendants arrested Jackson at the Joliet Police Station. These allegations are sufficient to state a claim that the Joliet Defendants played a "significant role" in Jackson's prosecution. Therefore, Joliet's motion to dismiss Jackson's malicious prosecution claim is denied.

## II.    Crest Hill's Motion

Crest Hill's motion seeks dismissal of only the Section 1981 claim (Count IV) against Opiola and Clark arguing that Jackson fails to allege discriminatory intent. Section 1981 provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The statute protects both the privilege to make and enforce contracts, as well as benefits provided by the contract. *Id.* § 1981(b) (The phrase "make and enforce contracts" means "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."). The statute covers not only conduct by the contracting parties, but third parties who act to impair protected privileges. *See Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 896 (7th Cir. 2015)

16

(recognizing that third-parties may be liable under the statute for tortiously interfering with an employee's relationship with her employer for racial reasons); *A.H. Employee Co. v. Fifth Third Bank*, 2012 WL 686704, at *13 (N.D. Ill. Mar. 1, 2012) ("under section 1981, individuals who are personally involved in impairing the right to contract may be held liable"); *Garcia v. Rush-Presbyterian-St. Luke's Medical Center,* 80 F.R.D. 254, 267 (N.D. Ill. 1978) ("[A] third party's interference with rights guaranteed by section 1981 will subject such a person to personal liability."). The statute prohibits only intentionally racially discriminatory conduct. *See Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996) ("To establish a claim under § 1981, the plaintiffs must show that . . . the defendant had an intent to discriminate on the basis of race[.]").

Opiola and Clark argue that Jackson's allegations do not plausibly demonstrate that they intended to discriminate against Jackson based on his race. Jackson has plausibly alleged that the Joliet defendants were motivated by racial discrimination because he has alleged that they were aware of his complaints about racism in the Department, his statements to the press, and the fact that he is Black. Jackson has not alleged, however, that Opiola and Clark had that knowledge. *See Smith v. Bray*, 681 F.3d 888, 905-06 (7th Cir. 2012) ("individual liability" for conspiracy to violate civil rights requires showing that each conspirator "shared a common unlawful motive"); *Walton v. First Merchants Bank*, 772 F. App'x 349, 351 (7th Cir. 2019) ("factual allegations [are required] to support a reasonable inference of discriminatory intent."); *Naguib v. Ill. Dep't of Prof'l Regulation*, 986 F. Supp. 1082,

1092 (N.D. Ill. 1997) ("[B]ald assertions of discriminatory animus behind the conspirators' action, unsupported by any meaningful, factual allegations is not enough to withstand a motion to dismiss."). Jackson has plausibly alleged that Opiola and Clark agreed to arrest Jackson without probable cause, and notably, Opiola and Clark have not moved to dismiss the false arrest or malicious prosecution claims against them. But there is simply no allegation in the complaint permitting the inference that Opiola and Clark were aware of the Joliet defendants' alleged discriminatory and retaliatory motivation. Therefore, Opiola and Clark's motion to dismiss the Section 1981 is granted.

## III. Baloy's Motion

Jackson claims that Baloy conspired with the other defendants to violate his civil rights and that Baloy's conduct constitutes intentional infliction of emotional distress under Illinois law. Baloy argues that Jackson has failed to plausibly allege that Baloy knowingly conspired with the other defendants and that he acted with the requisite intent for either claim.

Jackson has sufficiently alleged Baloy's agreement to withhold the surveillance video. Baloy is "related" to a Joliet police officer and Jackson alleges that Baloy said "the Joliet Police told him that if someone came around looking for that video, that I should tell them to give me a subpoena." These allegations are sufficient to plausibly demonstrate that Baloy agreed with the Joliet defendants to withhold the surveillance video.

However, Jackson's allegations of discriminatory intent against Baloy suffer from the same deficiency as his Section 1981 allegations against Opiola and Clark. Intent can be alleged generally. But Jackson makes no allegation at all about Baloy's intent. *See Stillwell v. Mayflower Contract Servs., Inc.*, 1995 WL 368898, at *5 (N.D. Ill. June 19, 1995) (the plaintiff must allege that "*each* alleged conspirator had an unconstitutional intent" (citing *Cunningham v. Southlake Center for Mental Health, Inc.,* 924 F.2d 106, 108 (7th Cir. 1991))) (emphasis added). As discussed, the discriminatory and retaliatory intent of the other defendants can be plausibly inferred from their alleged conduct and the context; for instance, the timing of the suspension and arrest close in time to Jackson's statements; or the allegations that Jackson is Black and was arrested without probable cause despite (or because of) his position as a police officer. But Baloy is not a member of the Joliet Police Department. Jackson has not alleged that he has a personal relationship with Baloy. Jackson has not alleged that Baloy was aware of Jackson in any way, let alone that Baloy knew Jackson was Black. At most, Jackson has alleged that Baloy agreed with the Joliet Defendants to withhold the videotape absent a subpoena. But without an allegation that Baloy was aware that the Joliet defendants asked him to do this in order to harm Jackson, Jackson has failed to allege that Baloy acted with discriminatory intent. True, the possibility of an innocent explanation is an insufficient basis to grant a motion to dismiss. *See Geinosky v. City of Chicago*, 675 F.3d 743, 750 (7th Cir. 2012) ("[W]e cannot resolve the question of Officer Aguilar's alleged involvement on the pleadings merely because we can imagine an innocent explanation for the alleged

actions.). But the plaintiff must plausibly allege a nefarious explanation. Here, as with Opiola and Clark, Jackson has not made any a plausible allegation regarding Baloy's intent. Without an allegation of intent, the claims against Baloy must be dismissed.

The lack of a plausible allegation of intent is also fatal to Jackson's intentional infliction of emotional distress claim against Baloy. Without a plausible allegation that Baloy knew the potential consequences of withholding the video and why the Joliet defendants were asking him to withhold it, Jackson has failed to allege that Baloy intended to cause Jackson emotional distress.

## IV. Punitive Damages

Joliet contends that Jackson's complaint seeks punitive damages against Joliet. Joliet argues that this claim should be dismissed because Illinois municipalities are not liable to pay punitive damages under Illinois law. The Court is not certain based on its reading of Jackson's complaint that he seeks punitive damages from Joliet. In any event, damages are not yet at issue. Decisions on available damages will await a motion in limine or preparation of jury instructions if this case goes to trial.

### Conclusion

Therefore, Joliet's motion [40] is denied; Crest Hill's motion [36] is granted; and Baloy's motion [27] is granted. The Section 1981 claims against Opiola and Clark, and all the claims against Baloy, are dismissed without prejudice. Jackson may file a motion for leave to file an amended complaint if he believes he can cure the

deficiencies in these claims described in this opinion. That motion must be filed by October 30, 2020 or dismissal of these claims will be with prejudice.

A status phone hearing is set for October 14, 2020, at which the parties should be prepared to set a discovery schedule. Jackson should also be prepared to state whether he intends to file a motion to leave to file an amended complaint.

ENTERED:

Thomas M Durkin

Honorable Thomas M. Durkin
United States District Judge

Dated:  September 29, 2020