UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **DAVID C. JACKSON,** | ) | |
| | ) | **No. 19-cv-7284** |
| **Plaintiff,** | ) | |
| | ) | **Judge Jeffrey I. Cummings** |
| **v.** | ) | |
| | ) | |
| **CITY OF JOLIET, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

David Jackson ("Jackson"), a Joliet police detective and the President of the Joliet Black Police Officers Association, brings this suit against the City of Joliet and certain Joliet and Crest Hill, Illinois police officers. Jackson alleges that the Joliet defendants "tried to silence his speech in opposition to the Joliet Police Department's deeply entrenched racially discriminatory culture," and conspired with the Crest Hill defendants to arrest him, obstruct his ability to obtain exculpatory evidence in the two misdemeanor domestic battery charges stemming from his arrest, and place him on administrative leave. (Dckt. #64 at 1–2, 14). In the process, according to Jackson, defendants retaliated and discriminated against him based on his race in violation of his federal constitutional and statutory rights and his rights under various state law theories. (*Id.* at 20–37 (alleging violations of the First, Fourth, Fifth, and Fourteenth Amendments, 42 U.S.C. §§1981, 1983, 1985, and 2000(e) *et seq.*, and state common law)).

The Joliet and Crest Hill defendants now seek summary judgment. After defendants' motions were fully briefed, Jackson moved to supplement the evidentiary record to include a report issued by the Office of the Illinois Attorney General on December 12, 2024 regarding its investigation into the Joliet Police Department. For the reasons that follow, Jackson's motion to

1

supplement, (Dckt. #260), is granted; defendants' motions for summary judgment (Dckt. ##180, 187) are granted as to Jackson's federal claims; and Jackson's state law claims are dismissed without prejudice.

## I.     MOTION TO SUPPLEMENT THE RECORD

After the parties completed their briefing on summary judgment, Jackson filed a motion to supplement the record with a report issued by the Office of the Illinois Attorney General ("AG") dated December 12, 2024 (the "Report"), (Dckt. #261-1). The Report details the results of a civil pattern or practice investigation into the Joliet Police Department ("JPD")—which was formally opened at the request of the City of Joliet (the "City"), on September 8, 2021. (Dckt. #261-1 at 5, 14–16). The AG's findings in the 158-page report include:

- "reasonable cause to believe that JPD engages in a pattern and practice of discriminatory policing against Black people in violation of the Illinois Civil Rights Act (ICRA) and the Illinois Human Rights Act (IHRA);"

- "other evidence of intentional discrimination against Black and Latino people. This evidence includes the use of racially derogatory language both toward members of the public and within JPD, as well as JPD's failure to hold officers and supervisors accountable for racially biased conduct;"

- "Black people are disparately impacted by JPD's enforcement activities in a manner that violates the IHRA and ICRA;"

- "Certain JPD officers' use of racial slurs and racially coded language in the community with little or no consequence, is also evidence of JPD's discriminatory intent;"

- "Officers reported to our investigative team that it is not uncommon to hear JPD members use racial slurs, including the n-word, while on duty;"

- "White officers also reportedly discourage recruits from joining the [BPOA], a professional organization that, among other things, advocates for the interests of Black officers at JPD;"

- "[B]ias against people of color is common at JPD. Even if it is not always directed at members of the public, the hostility that non-White officers experience within

JPD, especially at the hands of JPD supervisors, is additional evidence that JPD's disparate policing practices are motivated by discriminatory intent;" and

- "JPD also fails to adequately investigate allegations of racial bias and fails to sustain allegations when clear evidence of bias exists."

(Dckt. #261-1 at 58–59, 68, 71–74).

Jackson argues that the Report is admissible under Federal Rule of Evidence 803(8), which embodies the public records exception to the hearsay rule, and asserts that the Report's findings provide further evidence to support his claims that defendants discriminated against him based on his race and lacked probable cause to arrest him. (*Id.* at 7–9). The Joliet defendants,[1] on the other hand, assert that the Report is inadmissible because it is inherently untrustworthy within the meaning of Rule 803(8). (Dckt. #265 at 3–6). The Joliet defendants further assert even if the Report as a whole is admissible, that any witness statements within the Report are inadmissible "hearsay within hearsay" and that the findings within the Report are "irrelevant" to Jackson's claims. (*Id.* at 6–11). The Court largely agrees with Jackson on these issues.

## A.  The Report is Admissible Under Rule 803(8).

The parties dispute whether the Report is admissible under the hearsay exception embodied in Rule 803(8)(A)(iii), which allows "factual findings from a legally authorized investigation" into evidence in a civil case if the opponent "does not show that the information or other circumstances indicate a lack of trustworthiness." Fed.R.Evid. 803(8)(A)(iii); *Daniel v. Cook Cnty.*, 833 F.3d 728, 739 (7th Cir. 2016). Here, the Court finds—and the Joliet defendants do not dispute—that the AG is a government agency with legal authority to conduct investigations and to prepare evaluative reports (like the Report) which contain both opinions

---

[1] Jackson seeks to offer the Report against the Joliet defendants only, and the Crest Hill defendants assert that the Report should not be used or considered in any way against them when the Court evaluates their summary judgment motion. (Dckt. #265 at 1 n.1).

and conclusions. (Dckt. #261-1 at 5–6, 14–17; Dckt. #265 at 3–4). As the Seventh Circuit has made clear, such evaluative reports are "presumed to be admissible in a civil case" and courts "assume that public officials, in crafting such a report, acted 'properly and without bias.'" *Daniel*, 833 F.3d at 740, *quoting Jordan v. Binns*, 712 F.3d 1123, 1132 (7th Cir. 2013). Moreover, "[t]he burden to show untrustworthiness lies on the party seeking to exclude an evaluative report." *Daniel*, 833 F.3d at 740; *Jordan*, 712 F.3d at 1134.

The Joliet defendants attempt to meet their burden of showing that the Report is untrustworthy by relying on the four factors set forth in the Advisory Committee notes to Rule 803(8), namely, "the timeliness of the investigation; the special skill or expertise of the official; whether a hearing was held; and possible motivational problems with the investigator." (Dckt. #265 at 4 (citing *Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538, 2005 WL 88973, at *19 (N.D.Ill. Jan. 13, 2005)). However, the Seventh Circuit has made clear that "[t]he test laid out by the committee note is not the law of this court, and the presumption of admissibility in the text of Rule 803(8) is not reversed" by the note. *Daniel*, 833 F.3d at 741. The Seventh Circuit further noted that "[t]he factors enumerated in the committee note were not intended to be applied mechanically." *Id.*

In any event, the Court does not find defendants' arguments regarding the Committee's factors to be persuasive. First, defendants raise questions about the timeliness of the investigation claiming that it began one year before the date that the AG said it commenced, and it took years to complete. (Dckt. #265 at 4–5). However, this Court has no basis to disbelieve the AG's statement about when it formally opened a pattern or practice investigation into the JPD, (Dckt. #261-1 at 15), and it is no surprise that its investigation took a considerable amount of time to complete given the vast scope of the investigation. Among other things, the AG's

investigative team interviewed: multiple City officials (including the former mayor, city manager, and the former chair of the Board of Fire and Police Commissioners); representatives of the JPD officers' union, the supervisors' union, and the BPOA; more than 100 current and former JPD members; community residents and advocates; and representatives from the Will and Kendall County State's Attorney's Offices and attorneys from the defense and plaintiffs' bar. (*Id.* at 16–17). The AG's team also "reviewed hundreds of incidents and several years of data documenting JPD's activities" including thousands of documents and photographic and video evidence, "partnered with a research organization at the University of Chicago to assist with data review, data sampling, and statistical analysis," and engaged in "a thorough review of JPD's policies, procedures, and training materials." (*Id.* at 17).

Second, defendants imply that the AG's investigative team was not "competent to conduct the investigation in question." (Dckt. #265 at 5). Nonsense. The AG's "investigative team consisted of career attorneys and staff from several divisions and bureaus within [the AG's Office], as well as nationally recognized subject matter experts. . . . includ[ing] former law enforcement officials and civil rights attorneys, many of whom have conducted police pattern or practice investigations in other jurisdictions" and whose "expertise included use of force, accountability, training, supervision, community policing, sexual assault, domestic violence, discriminatory policing, and more." (Dckt. #261-1 at 17). It is hard to imagine what kind of team would be more qualified to conduct such an investigation than the AG's investigative team.

Finally, defendants contend that "the sources of information relied upon by the AG's Office do not cloak the investigation with trustworthiness." (Dckt. #265 at 5). This is an odd point for these defendants to make given that the AG's team relied heavily upon its interviews with the City's leadership (past and present), JPD's leadership and rank-and-file, and JPD's

documentary, photographic, and video evidence. The Court presumes that this information is trustworthy enough for consideration within the Report, and defendants offer no suggestion as to what else the AG's investigative team should have considered.

For these reasons, the Court in its discretion finds that defendants have failed to meet their burden of showing that the circumstances surrounding the preparation of the Report demonstrate a lack of trustworthiness. *See Daniel*, 833 F.3d at 739–42.[2]

### B. Certain Findings Within the Report are Relevant to Jackson's Race Discrimination Claims.

The Report's findings as set forth above are troubling, and they raise serious concerns about the degree to which racial bias against African Americans may be infecting the culture and operations of the JPD. Nonetheless, the Joliet defendants assert that the Report is irrelevant to Jackson's race discrimination claims. (Dckt. #265 at 7–11). In particular, defendants assert that the pattern and practice findings appear to be based on statistical evidence that do not involve a group of African Americans who are similarly situated to Jackson; the type of adverse actions identified in the Report bear no resemblance to the adverse employment actions Jackson attributes to defendants; the lack of adequate supervisory oversight and responsiveness to racial discrimination complaints concern citizen complaints, and not those initiated by JPD employees; and the findings of racial bias are not linked to the three individual Joliet defendants and therefore not evidence of their motivations. (*Id.*).

When evaluating defendants' relevance objection, the Court is mindful of the Seventh Circuit's observation that:

---

[2] The Court will not, however, consider any inadmissible statements within the Report that would constitute "hearsay within hearsay." *See, e.g., Mathin v. Kerry*, 782 F.3d 804, 809 (7th Cir. 2015), *as amended on denial of reh'g* (June 7, 2015).

> Proof of [intentional] discrimination is always difficult. Defendants of even minimal sophistication will neither admit discriminatory animus nor leave a paper trail demonstrating it; and because most employment decisions involve an element of discretion, alternative hypotheses (including that of simple mistake) will always be possible and often plausible . . . . A plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled by evidentiary rulings that keep out probative evidence because of crabbed notions of relevance or excessive mistrust of juries.

*Riordan v. Kempiners*, 831 F.2d 690, 697–98 (7th Cir. 1987). The Third, Sixth, and Eighth Circuits have quoted from *Riordan* and followed the Seventh Circuit on this point. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996); *Robinson v. Runyon*, 149 F.3d 507, 513 (6th Cir. 1998); *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1103 (8th Cir. 1988), *overruled in part on other grds.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Moreover, the appellate courts "carefully examine blanket *pre-trial* evidentiary rulings" in discrimination cases. *Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 357 & n.7 (5th Cir. 1995) (citing *Riordan* and *Estes*).

The Court is hesitant to find as a matter of law that the AG's reasonable cause finding that the JPD engages in a pattern and practice of discriminatory policing against Joliet's African American residents in violation of Illinois' civil rights laws is irrelevant to Jackson's claim that he was subject to racial discrimination as a JPD employee. Indeed, in an analogous situation, the Eighth Circuit found that "[i]t defies common sense to say, as Ford implies, that evidence of an employer's discriminatory treatment of black customers might not have some bearing on the question of the same employer's motivation in discharging a black employee." *Estes*, 856 F.2d at 1104; *Kelly*, 61 F.3d at 358 (same, *quoting Estes*). Moreover, the AG's pattern and practice findings were not limited to disparate impact based on statistical evidence (as defendants assert) but also included evidence of intentional racial discrimination against African Americans.

7

Finally, the AG's investigative team found evidence of racial discrimination against African American officers *within* the JPD (including JPD members' use of racial slurs while on duty, the hostility that non-White officers experience within JPD, especially at the hands of JPD supervisors, and White officers' efforts to discourage recruits from joining the BPOA). Such evidence of a discriminatory atmosphere at a plaintiff's place of employment, while not conclusive proof of discrimination, tends to add "'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir. 1987); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356–57 (6th Cir. 1998) (citing *Conway*); *Anaya v. Birck*, No. 21-CV-02624, 2022 WL 1523640, at *6 (N.D.Ill. May 13, 2022) ("Courts from this Circuit and elsewhere have held that evidence of a racially-biased corporate culture can be circumstantial evidence of discrimination against a particular plaintiff") (cleaned up); *Martin v. F.E. Moran*, No. 13 C 3526, 2017 WL 1316255, at *27–28 (N.D.Ill. Apr. 10, 2017). This remains true even where the discriminatory history and work practices are not aimed specifically at the plaintiff. *Robinson*, 149 F.3d at 512–14.

In sum: the Court finds that the findings within the Report regarding the JPD's discrimination against Joliet's African American residents and JPD employees is relevant circumstantial evidence regarding Jackson's race discrimination claims.[3]

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

---

[3] The Court does, however, reject Jackson's argument that the Report's findings are relevant to his claim that defendants lacked probable cause to arrest him for domestic battery.

law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence of a factual dispute between the parties will not preclude summary judgment *unless* it is a genuine dispute as to a material fact); *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) (issues of material fact are material if they are outcome determinative). In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cnty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020).

When the moving party has met that burden, the non-moving party cannot rely on mere conclusions and allegations to concoct factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Moreover, this Court can rely only upon admissible evidence, or, at a minimum, evidence that is not in admissible form but could be rendered admissible when offered for trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920–21 (7th Cir. 1994); *Desert Ridge Resort LLC v. Occidental Fire & Cas. Co. of N. Cardina*, 141 F.Supp.3d 962, 972 (D.Ariz. 2015) ("if the evidence could conceivably be converted into an admissible form for trial, the Court [may] consider the evidence for the purposes of summary judgment.") (cleaned up); *Robinson v. Hartzell Propeller Inc.*, 326 F.Supp.2d 631, 635 (E.D.Pa. 2004) (same). Furthermore, under Northern District of Illinois Local Rule 56.1, the non-moving party on summary judgment must provide a response that either admits or denies each of the moving party's statements of fact and must support any denials with specific citation to affidavits, parts of the record, or other supporting evidence. *See* N.D.Ill. Local Rule 56.1(b)(3).

Where the non-moving party fails to identify such materials, the moving party's allegations, where properly supported, will be deemed admitted. *Id.*

Finally, the non-moving party must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009); *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("A party seeking to defeat a motion for summary judgment is required to wheel out all its artillery to defeat it.") (cleaned up). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248. Ultimately, summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up).

## III.     BACKGROUND FACTS

The Court draws the factual record from the parties' pleadings; the Joliet defendants' Local Rule 56.1 statement of material facts ("JSOF"), (Dckt. #188); the Joliet defendants' accompanying exhibits; Jackson's Rule 56.1 statement in opposition to JSOF ("JSOF Resp."), (Dckt. #209); Jackson's Rule 56.1 statement of additional facts ("Joliet PSAF"), (Dckt. #200); Jackson's accompanying exhibits; the Joliet defendants' response to Joliet PSAF ("Joliet PSAF Resp."), (Dckt. #231); the Crest Hill defendants' Local Rule 56.1 statement of material facts ("CHSOF"), (Dckt. #182); the Crest Hill defendants' accompanying exhibits; Jackson's Rule 56.1 statement in opposition to CHSOF ("CHSOF Resp."), (Dckt. #213); Jackson's Rule 56.1 statement of additional facts ("Crest Hill PSAF"), (Dckt. #208); Jackson's accompanying

exhibits; and the Crest Hill defendants' response to Crest Hill PSAF ("Crest Hill PSAF Resp."), (Dckt. #230).[4]

## A.     Facts

The following pertinent facts are construed in the light most favorable to the non-movant, Jackson.[5]  Jackson is a Joliet police officer.  (CHSOF Resp. ¶1).  At all relevant times, defendant Ed Clark ("Clark") was the Chief of Police for the City of Crest Hill, and defendant Jason Opiola ("Opiola") was a Sergeant Investigator at the Crest Hill Police Department.  (*Id.* ¶¶ 2–3).  Clark and Opiola are referred to herein as the "Crest Hill defendants."

At all relevant times, defendant Al Roechner ("Roechner") was the Chief of Police for defendant City of Joliet (again, the "City"), defendant John Perona ("Perona") was the Joliet Deputy Police Chief, and defendant Joseph Rosado ("Rosado") was a Lieutenant in Internal Affairs.  (JSOF Resp. ¶¶2–3, 6).  The City, Roechner, Perona, and Rosado are referred to herein as the "Joliet defendants."

---

[4] The Court notes that it granted Jackson's motion for leave to file certain exhibits and other filings under seal, (Dckt. #221), in consideration of his assertion that the documents "contain sensitive information in the form of police reports regarding an expunged matter, internal affairs reports of parties and third parties, personnel records of third parties, closed session recordings of the Joliet City Council marked Confidential by Defendants, confidential medical information of parties and third parties and other documents, and references to the confidential information are contained throughout deposition transcripts."  (Dckt. #198 at 2).  Despite its order sealing these exhibits, the Court will not issue this Memorandum Opinion and Order under seal.  "Secrecy in judicial proceedings is disfavored," *GEA Grp. AG v. Flex-N-Gate Corp.*, 740 F.3d 411, 419 (7th Cir. 2014), and "[d]ocuments that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality," *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir. 2002) ("In civil litigation only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence . . . is entitled to be kept secret.").  Because none of the information that forms the basis of the Court's decision is privileged or qualifies as a trade secret, the Court will not seal this decision.

[5] On many occasions, Jackson cites evidence that does not actually dispute defendants' proffered material facts.  In these instances, defendants' facts, where supported, are deemed admitted.

### 1. Jackson's Involvement with the Joliet Black Police Officers Association and His Comment to *The Times Weekly*

Jackson is African American and, at all times relevant to this matter, served as the President of the Joliet Black Police Officers Association ("BPOA"). (Joliet PSAF Resp. ¶1).

In early 2019, Jackson provided a comment to *The Times Weekly* regarding the termination of fellow officer and BPOA member, Lionel Allen. (JSOF Resp. ¶15; Dckt. #189-3, at 7–8). Jackson did not talk to any member of command before providing his comment and his statements were brought to Roechner and Perona's attention after the fact. (JSOF Resp. ¶¶16, 18; Dckt. #189-5 at 22). Perona instructed Internal Affairs to begin an investigation, (Dckt. #189-5 at 23), and then-lieutenant Rosado was tasked with investigating whether Jackson's statements were a violation of JPD policy, including General Order 8-4. (JSOF Resp. ¶20). General Order 8-4 provides, among other things, "[n]o member will make a public statement concerning plans, or affairs of the administration of the Department, unless authorized by the Chief or a Division Deputy Chief" and that "[m]embers may only speak with the media about an incident by authority of this directive or by appropriate supervisory consent." (*Id.* ¶24). Ultimately, Rosado found that Jackson made an unauthorized statement to the media, (*id.* ¶¶23, 25), and Jackson was issued a one-day suspension, which he has not yet served. (JSOF Resp. ¶35; Dckt. #189-3 at 14).

### 2. The March 9, 2019 Incident

On March 9, 2019, Christopher Russell ("Russell") called 911 to report that his mother, Stacy Ward ("Ward"), was bleeding at her residence after being beaten by her boyfriend. (Dckt. #183 at 5; Dckt. #183, Exhibit G, at 1:40–1:47). Russell advised that the boyfriend was a Joliet police officer by the name of Dave Jackson. (Dckt. #183 at 5).

### a.    The Crest Hill Defendants' Interview of Ward

On the evening of March 9, 2019, non-party Crest Hill officers John McHale and David Reavis were dispatched to Ward's residence. (Dckt. #189-7 at 18, 30). When they arrived, both officers observed that Ward had blood on her face and clothes, and that there was an overturned chair and broken glass in her home. (*Id.*). Photos of the scene show pill bottles in various rooms and at least one wine bottle. (Joliet PSAF Resp. ¶37; Crest Hill PSAF Resp. ¶30). Reavis contacted Opiola and non-party Detective Joseph Locasto for assistance with the investigation. (Dckt. #183 at 14, 16).

McHale and Reavis later interviewed Ward at the Crest Hill Police Department. (JSOF Resp. ¶51). In the interview, Ward recounted the evening as follows: she and Jackson had been at Dar's Bar in Joliet drinking and gambling, (*id.* ¶52);[6] on the drive back to Ward's residence, she and Jackson got into a verbal altercation about money, (Dckt. #183 at 6; Dckt. #183, Exhibit F, at 4:45 to 5:06); once they arrived at Ward's home, the argument turned physical and Jackson "body slammed" her, (JSOF Resp. ¶54); she threw a glass measuring cup at Jackson which broke on the kitchen floor, (Dckt. #183, at 6; Dckt. #183, Exhibit F, at 8:35–9:28); and she eventually

---

[6] Jackson objects to this fact, and many others, as inadmissible hearsay, but fails to explain how the statements are being offered as proof of the truth of the matter asserted. Fed. R. Evid. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement."); *see also Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019) (failure to develop hearsay argument is enough to dispense with it). Jackson's contention appears to be that third-party witness statements summarized in the officers' police reports are inadmissible hearsay (or hearsay within hearsay). *Jordan*, 712 F.3d at 1133 ("[T]hird-party statements contained in a police report do not become admissible for their truth by virtue of their presence in a public record and instead must have an independent basis for admissibility."). The witness statements, however, have been offered to show what information had been provided to defendants and the effect that the information had on them irrespective of whether the statements are, in fact, true. *Torry*, 932 F.3d at 585 (statements introduced to show effect on listener, rather than truth of matter asserted, are not hearsay); *Woods v. City of Chicago*, 234 F.3d 979, 986–87 (7th Cir. 2000) (statement in police report not hearsay if offered "to show the effect that the statements had on the officers" who heard it). Accordingly, Jackson's hearsay objections with respect to the third-party witness statements are denied and the fact that these witness statements are contained in the police reports are deemed admitted.

stated she was going to call the police, after which Jackson left the residence, (Dckt. #183 at 6; Dckt. #183, Exhibit F, at 9:32 to 9:52).

Opiola spoke with Ward following her interview with McHale and Reavis and generally had the opportunity to observe her while she was at the Crest Hill Police Department. (JSOF Resp. ¶42; Dckt. #183 at 16). Opiola did not see anything that led him to believe Ward was under the influence of drugs or alcohol to the extent that it would inhibit her ability to give clear, accurate, and truthful information. (JSOF Resp. ¶43).[7]

### b. The Joliet Defendants' Interview of Ward

On the evening of March 9, 2019, Roechner received a call indicating that Jackson had been involved in a domestic incident at Crest Hill. (JSOF Resp. ¶37; Dckt. #189-4 at 39). After learning of the incident, Roechner called Perona who, as the Administrative Deputy Chief, oversaw Internal Affairs. (JSOF Resp. ¶38). Roechner informed Perona of what he heard, and instructed Perona to contact Rosado and start an administrative investigation. (Id. ¶¶38–39). Perona and Rosado went to the Crest Hill Police Department on March 9, 2019. (Id. ¶40).

Rosado interviewed Ward while at Crest Hill. (Id. ¶57; Crest Hill PSAF Resp. ¶26). Ward's account was similar to the account she gave McHale and Reavis. (JSOF Resp. ¶¶58–59; Dckt. #189-7 at 36). Ward said she busted her head and her lip during the altercation, (JSOF Resp. ¶62; Dckt. #189-7 at 37), and photos of Ward taken on March 9, 2019 depict injuries consistent with her statements, (JSOF Resp. ¶63; Dckt. #189-7 at 37). Ward also completed a

---

[7] Jackson bases his denial of this fact, and many others, on citations to Ward's deposition testimony, taken several years after the night of the incident, wherein Ward admits that she was under the influence of drugs and alcohol on March 9, 2019 and "could have got a lot of things wrong that night." (*See e.g.*, JSOF Resp. ¶43) (citing Tr. of Feb. 25, 2022 Ward Deposition at 55:9–19, 57:4–16, 61:3–65:10.) But, Ward's testimony does not refute what Opiola observed on March 9, 2019. In these instances, where Jackson's record citations do not refute the particular statement of fact, defendants' statement of fact will be deemed admitted.

Complaint of Domestic Violence Victim form where she again identified Jackson as the individual who physically abused her. (Dckt. #189-7 at 16).

The Joliet defendants admit that Jackson was on leave for an on-duty injury at the time of the incident due to knee issues. (Joliet PSOF Resp. ¶40). The Joliet defendants also do not dispute that Roechner, Perona, and Rosado were aware that he had knee issues and was on leave. (*Id.*). Opiola admits he was told by Joliet officers on March 9, 2019, that Jackson had bad knees. (Crest Hill PSAF Resp. ¶3).

### c.      Jackson's Conversation with Opiola and Rosado

Opiola asked Rosado to call Jackson. (JSOF Resp. ¶44). Rosado complied and spoke with Jackson before passing the phone to Opiola. (*Id.* ¶45). Jackson admitted to Opiola that he had been out gambling and drinking with Ward earlier on March 9th, but denied pushing or body slamming her. (*Id.* ¶¶47, 50). Jackson told Opiola that Ward was talking pills and had been drinking that evening. (Joliet PSOF Resp. ¶35). Jackson claims he told Rosado and Opiola the following information, which Rosado and Opiola dispute: that Ward had pre-existing injuries in the form of bruises from a fall the night before at Zobel's Tavern and to check the surveillance recording, (Joliet PSOF Resp. ¶38; Dckt. #203-2, at 121); to check Ward's cell phone for a message she sent to the bartender at Zobel's Tavern, apologizing for certain behavior, (Joliet PSOF Resp. ¶39); and to check Ward's history of calls for service at her address, (Joliet PSOF Resp. ¶43).

### d.      Arrest Warrant Issued for Jackson

Detective Locasto obtained a signed arrest warrant for Jackson for two counts of domestic battery from Judge Theodore Jarz. (JSOF Resp. ¶65; Dckt. #184 at 33).

### e.    Jackson Reports to the JPD and is Arrested

Roechner told Perona to call Jackson into the JPD and put Jackson on administrative leave.  (JSOF Resp. ¶68).  Jackson testified that when he arrived at the JPD, a lieutenant took his weapon and he was searched by either Perona or another individual.  (*Id.* ¶74).  Jackson was placed in an investigation room, after which Rosado served him with his administrative paperwork.  (*Id.* ¶75).  Perona testified that he took Jackson to investigations because "[t]here was a warrant for his arrest and Crest Hill was there to take him into custody."  (*Id.* ¶76).  Jackson was then taken out of the JPD and handed over to the Crest Hill officers, who handcuffed him, arrested him for domestic battery, and transported him to Crest Hill.  (*Id.* ¶¶77–78).

### 3.    Events Following the March 9, 2019 Incident

Shortly after the March 9 incident, Roechner spoke to the City Council in executive/closed session regarding Jackson.  (Joliet PSAF Resp. ¶52).  Roechner stated with respect to the incident that "it's not good" and when asked if he would be terminated, Roechner responded "it depends on what we find."  (*Id.*; Pl.'s Ex. 15 at 2:10).

Carlos Matlock, a Joliet police officer, testified that on March 21, 2019 he attended the Joliet police weekly meeting.  (Crest Hill PSAF Resp. ¶43).  Matlock further testified that at the meeting, Roechner and Perona stated that there was a lot of evidence against Jackson, that the victim had blood on her face and clothes, that she "gave a real good interview" and even if she didn't want to cooperate, the state could play the video recording.  (*Id.*).

On July 1, 2019, the domestic battery charges against Jackson were dropped.  (JSOF Resp. ¶81).  On August 15, 2019, Rosado interviewed Jackson in reference to the case involving Ward.  (*Id.* ¶83).  In an interoffice memorandum dated January 8, 2020, from Roechner to

Rosado, Roechner wrote that he had determined Jackson made statements during his interview that constituted intentional misrepresentations. (*Id.* ¶ 97). In a Notice of Complaint Disposition dated January 9, 2020, Rosado notified Jackson that he had been found to have violated certain General Orders, as well as "720 ILCS 5/12-3.2 Domestic Battery," and that the recommended penalty was a thirty-day suspension. (*Id.* ¶102). Jackson was ultimately issued a thirty-day suspension, but has not yet served the suspension. (*Id.* ¶107).

## III.   ANALYSIS

The Joliet defendants and the Crest Hill defendants both move for summary judgment on the various federal and state law claims asserted against them. Given that the Court's jurisdiction over Jackson's state law claims against defendants hinges on the viability of his federal claims, the Court begins with Jackson's federal claims. For the reasons set forth below, the Court finds that Jackson has failed to provide sufficient evidence to enable his federal claims against defendants to survive summary judgment and it relinquishes jurisdiction over his state-law claims in accordance with Seventh Circuit guidance.

### A.   Jackson's Fourth Amendment Claim Fails.

The crux of Jackson's Fourth Amendment claim is his contention that the defendant officers violated his Fourth Amendment right of freedom from unreasonable seizure by arresting him without probable cause. (Dckt. #64 ¶168). In their respective motions, both sets of defendants argue that summary judgment is proper on Jackson's Fourth Amendment claim because the officers' actions did not amount to a "seizure" for purposes of the Fourth Amendment and probable cause existed for Jackson's arrest. Because probable cause is a complete defense to false arrest claims brought under the Fourth Amendment, *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014), the Court places the parties' contentions regarding the alleged

seizure of Jackson aside and focuses on their arguments regarding the existence of probable cause.

### 1. Probable Cause Existed for Jackson's Arrest.

Officers possess probable cause to arrest a suspect when "the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense." *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007) (cleaned up). "A court evaluates probable cause not with the benefit of hindsight, and not on the facts as perceived by an omniscient observer, but on the facts as they appeared to a reasonable person in the defendant's position, even if that reasonable belief turned out to be incorrect." *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 622 (7th Cir. 2010) (cleaned up). So long as the facts sufficient to create probable cause are undisputed, probable cause is a question of law. *Kies v. City of Aurora*, 156 F.Supp.2d 970, 981 (N.D.Ill. 2001) (citing *Potts v. City of Lafayette*, 121 F.3d 1106, 1112 (7th Cir. 1997)).

The Seventh Circuit has observed that the hurdle to establish probable cause is low, *Barnett v. City of Chicago*, No. 18 CV 7946, 2025 WL 1122049, at *3 (7th Cir. April 16, 2025), and is an objective inquiry based on the time the criminal complaint was filed, *Brown v. City of Chicago*, 709 F.Supp.3d 558, 569 (N.D.Ill. 2023); the "officers must have more than a bare suspicion that they have the right guy, but they need not have enough evidence to support a conviction or even to show that their belief is more likely true than false." *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010) (citation omitted).

Thus, the issue here is not whether Jackson actually committed the crime of domestic battery. Rather, the Court's inquiry focuses solely on whether the facts taken in the light most favorable to Jackson show that a reasonable person in the officers' position would have had

probable cause to believe that Jackson caused bodily harm to Ward.[8]  Given the undisputed facts, the Court finds, as a matter of law, that they would.

The record contains several pieces of undisputed evidence which, taken together, could have led a reasonable person in the officers' position to believe that a domestic battery had been committed.  On the evening of March 9, 2019, Russell reported to the police that his mother, Ward, had been beaten up at her residence and named Jackson as the assailant.  The responding officers observed broken glass in the kitchen and other signs of a struggle.  At the police station, Ward provided a recorded video statement and completed a "Complaint of Domestic Violence Victim" form indicating that Jackson physically abused her.  Later on in the evening, Ward recounted a similar story to Rosado when he interviewed her as part of JPD's internal investigation.  (JSOF Resp. ¶¶57–63).  Photos of Ward from the night in question depict injuries to her forehead and lip.  (Dckt. #183 at 77, 79).

The Court finds that the general consistency of the account Ward provided to several officers, coupled with her visible injuries, provided the officers with reasonably trustworthy information sufficient to warrant a prudent person to believe that Jackson had committed an offense.  After all, a reasonably credible complaint of a single witness or victim alone generally is sufficient to establish probable cause.  *See Lee v. Harris*, 127 F.4th 666, 672 (7th Cir. 2025) ("[O]ur court has held repeatedly that a single eyewitness identification is enough to provide a defense against Fourth Amendment claims.") (citations omitted).  Because Ward's account provided the officers with more than a bare suspicion that Jackson caused her bodily harm, they had probable cause to arrest Jackson.

---

[8] Under Illinois law, a person commits domestic battery if he knowingly, without legal justification by any means: (1) causes bodily harm to any family or household member; (2) makes physical contact of an insulting or provoking nature with any family or household member.  *See* 720 ILCS 5/12-3.2.

Moreover, "when a neutral magistrate issues an arrest warrant, we presume the validity of the warrant and the information offered to support it." *Id.* Indeed, the Supreme Court has noted that "[w]here the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or in objective good faith." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (cleaned up). The Court heeds this guidance and gives great deference to Judge Jarz's determination.

With these facts in hand, the Court finds as a matter of law that a reasonable officer in defendants' shoes had probable cause to believe Jackson caused bodily harm to Ward.

Jackson attacks defendants' assertion of probable cause on various grounds which can be distilled into a single assertion that several pieces of information received by the officers should have raised the officers' suspicion regarding the veracity of Ward's accusations. He correctly states that if a victim's complaint "would lead a reasonable officer to be suspicious," the officer has a duty to reasonably investigate its truthfulness. *Zitzka v. Village of Westmont*, 743 F.Supp.2d 887, 908 (N.D.Ill. Sept. 28, 2010) (cleaned up). Specifically, Jackson argues that the following facts, some of which are contested, should have raised the officers' suspicions about the veracity of Ward's statements: (1) Jackson told certain officers that Ward was intoxicated and had been taking pain pills; (2) the Crest Hill Police Department's system contained records showing prior calls for service had been made to Ward's address within the prior year, corroborating his statement about her alcohol and pill usage; (3) photographs of the scene showed pill bottles and at least one wine bottle; (4) Jackson told Rosado and Opiola that Ward sustained the bruises to her arms and legs during a fall the night prior; (5) Jackson instructed Rosado and Opiola to review Ward's cellphone for messages to the bartender regarding Ward's

20

behavior at Zobel's Tavern the night prior; and (6) Jackson reported he had bad knees, such that it would have been difficult for him to perform the acts Ward described.

These arguments are unavailing. Even construing the information offered by Jackson as true, once a law enforcement officer discovers sufficient facts to establish probable cause, the officer has no constitutional obligation to conduct any further investigation in the hope of discovering exculpatory evidence or possible defenses. *See Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648, 659 (7th Cir. 2024); *Eversole v. Steele*, 59 F.3d 710, 718 (7th Cir. 1995); *see also McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) (explaining an officer "may not ignore conclusively established evidence of the existence of an affirmative defense," but the Fourth Amendment imposes no duty to investigate whether a valid defense exists) (cleaned up). Further, Jackson provides no explanation how this alleged evidence addresses the undisputed facts that Ward provided a consistent story to several officers on March 9, 2019; had fresh injuries to her head and lip; and named Jackson as the assailant. The Court finds that based on all the information available, no reasonable jury could find that the officers did not have probable cause to arrest Jackson. Accordingly, the Court grants defendants' motions for summary judgment with respect to Jackson's Fourth Amendment claims.

**B.     Jackson Has Not Put Forth Sufficient Evidence to Raise a Genuine Issue of Fact Regarding His First Amendment Retaliation Claim.**

To establish a *prima facie* case of unlawful First Amendment retaliation, an employee must show that: (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter him from exercising his First Amendment rights; and (3) his speech was a motivating factor in his employer's adverse action. *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020). This third element amounts to a causation inquiry. *See, e.g.*, *Roger Whitmore's Auto. Servs., Inc. v. Lake County, Illinois*, 424 F.3d 659, 669–70 (7th Cir. 2005). To establish a

21

causal link between the protected speech and an adverse action by the employer, the plaintiff must show that the protected conduct was a substantial or motivating factor in the employer's employment decision. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

If a plaintiff establishes a *prima facie* case, the burden then shifts to his employer to demonstrate that it would have taken the same action in the absence of the plaintiff's protected speech. *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006). If the employer meets this burden, the plaintiff may still survive summary judgment by producing sufficient evidence to allow a reasonable fact finder to determine that the employer's reasons were merely a pretext for firing him for exercising his First Amendment rights. *Id.* This means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason for his termination is a lie. *Vukadinovich v. Bd. of Sch. Trustees of N. Newton Sch. Corp.*, 278 F.3d 693, 699 (7th Cir. 2002).

Jackson alleges in his Second Amended Complaint that defendants retaliated against him in violation of his First Amendment right by issuing him a one-day unpaid suspension for making statements to *The Times Weekly* in his capacity as president of the BPOA in February 2019.[9]  (Dckt. #64 ¶¶161–67).

---

[9] Jackson also claims that he engaged in First Amendment protected activity when he: (1) recommended a diversity candidate to the Interim City Manager on behalf of the BPOA on or around January 2019; (2) drafted a December 2018 letter to NBPA Chairwoman Pruitt and circulated it to BPOA Board Members; (3) advocated for Allen at a meeting with Roechner and Perona on or around January 2019; and (4) questioned an Internal Affairs' investigation into Allen at a February 2019 public meeting.  However, Jackson's argument in his brief in opposition to defendants' summary judgment motions focuses entirely on defendants' alleged retaliation for his comments to *The Times Weekly*.  Because Jackson has not developed his arguments regarding the remainder of his alleged First Amendment activity, his arguments as to these portions of his First Amendment claim are waived. *See, e.g.*, *Betco Corp. v. Peacock*, 876 F.3d 306, 309 (7th Cir. 2017) (noting that underdeveloped or conclusory arguments in response to motion for summary judgment are waived).

To start, defendants maintain that, based on *Nagle v. City of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009), an unserved suspension does not constitute an adverse action. (Dckt. #232 at 13). In *Nagle*, the plaintiff was given a suspension without pay, allegedly in retaliation for exercising his rights under Title VII. *Id.* Because the suspension was ultimately never served, the Seventh Circuit held its imposition did not constitute an adverse employment action, reasoning that that "[u]ncertainty as to whether the suspension will be upheld is not equivalent to actually serving the suspension because the plaintiff does not have to endure the same economic harm." *Id.* at 1020–21. Yet, Jackson fails to explain how his unserved suspension somehow falls outside the *Nagle* ruling, which, as another court in this District stated, "remains good law." *Strickland v. Dart*, No. 19-CV-02621, 2024 WL 5118194, at *5 (N.D.Ill. Nov. 25, 2024).

But even if Jackson's unserved suspension could serve as the basis for his First Amendment retaliation claim, the Court finds it would still fail. Jackson lumps all the defendants together for purposes of his claim; however, in order to have retaliated against Jackson for his statements, a defendant had to have first known of his protected speech. *McGreal v. Village of Orland Park*, 850 F.3d 308, 313 (7th Cir. 2017) ("To show that [an adverse action] was motivated by his protected speech, [a plaintiff] must first demonstrate that the defendants knew of the protected speech."). To survive each defendants' request for summary judgment on this claim, Jackson has to provide admissible evidence that would allow a reasonable jury to infer that each defendant was aware of that speech before he was issued the one-work day, unpaid suspension.

Jackson has not met his burden with respect to the Crest Hill defendants. Even assuming that Opiola and Clark were aware that Jackson was the president of the BPOA (which the Crest Hill defendants contest), Jackson's claim that the BPOA "was subject to several local media

stories" around the time of the March 9, 2019 incident fails to show that the Crest Hill defendants were aware of his protected speech, namely his statements to *The Times Weekly*. Because Jackson puts forth no evidence that the Crest Hill defendants knew of his speech, he fails to show that his speech was a motivating factor of any decision to serve him with a suspension, and summary judgment in Crest Hill's favor on Jackson's First Amendment retaliation claim is proper. *Stagman v. Ryan*, 176 F.3d 986, 999–1000 (7th Cir. 1999); *McGreal*, 850 F.3d at 313 (affirming grant of summary judgment in defendants' favor where plaintiff provided no evidence that defendants knew of his speech before firing him).

To survive summary judgment, Jackson must also present evidence that would allow a reasonable jury to infer one or more defendants were involved in the complained-of adverse employment decisions—here, his suspension in connection with *The Times Weekly* statements. *Mt. Healthy*, 429 U.S. at 287 (stating a plaintiff must establish a causal link between the protected speech and an adverse action by the employer).

Jackson has not produced any evidence showing that Perona or Rosado were involved in the adverse employment decision. Instead, Jackson broadly asserts that Perona and Rosado were each "directly involved" and "actively participated" in the alleged violation of his First Amendment rights based on Perona's instruction to Internal Affairs to begin an investigation into *The Times Weekly* incident and Rosado's investigation in Jackson's statements. Even viewed in Jackson's favor, this information is insufficient to support a reasonable inference that either Perona or Rosado were involved in the decision to issue a one-day, unpaid work suspension to Jackson. Because no evidence shows that Perona and Rosado were involved in the complained-of employment decisions, summary judgment in Perona and Rosado's favor on Jackson's First

Amendment retaliation claim is proper. *Hale v. Husfelt*, 772 Fed.Appx. 782, 784 (11th Cir. 2019).

Jackson nevertheless asserts that he has made a *prima facie* showing of causation, at least with respect to the Joliet defendants, because a May 13, 2019 "Notice of Administrative Review Hearing Disposition" that was issued to him specifically stated that he was being served with discipline, consisting of a one-day, unpaid suspension, because of his statements to *The Times Weekly*. Jackson does not support this "fact" with any evidence, and it is well within the Court's discretion to disregard it. N.D.Ill. Local Rules 56.1(d)(2). For this reason alone, summary judgment in the Joliet defendants' favor is proper.

But even if Jackson had established a *prima facie* First Amendment retaliation claim (the Court finds he has not), the Court would need to determine whether Roechner and the City (who do not contest that they knew of the protected speech and were involved in the employment decision at issue) have provided sufficient evidence to allow a reasonable jury to find that they have rebutted Jackson's claim by establishing that they would have taken the same actions in the absence of Jackson's protected speech. *See Ashman v. Barrow*, 438 F.3d 781, 784 (7th Cir. 2006); *see also Mt. Healthy*, 429 U.S. at 287. In particular, Roechner and the City assert that Jackson was served with a suspension not because of the *content* of his speech to *The Times Weekly*, but because of his failure to secure permission to speak to the media in violation of JPD policy. This is a facially legitimate reason and Jackson has not offered sufficient evidence to create a genuine dispute as to whether defendants' stated reasons for his discipline are pretextual.

Jackson attempts to meet his burden by arguing that he was treated differently and more harshly than a similarly situated officer—namely, Officer Cardwell. However, Cardwell is not a proper comparator because he is not similarly situated to Jackson. The undisputed facts establish

that Officer Cardwell approached Roechner to give him a "heads up" about an upcoming media interview, and Roechner perceived that "heads up" as a way of seeking permission. (Dckt. #205, at 16; Dckt. #189-1, ¶6). Thus, Cardwell (unlike Jackson) informed Roechner of his media interview *before* his interview actually took place. As a result, the Court finds that Officer Cardwell is not a similarly situated colleague for purposes of pretext analysis.

In sum: Jackson has not put forth sufficient evidence to allow a reasonable jury to find that: (1) the Crest Hill defendants were aware of his protected speech; (2) defendants Rosado and Perona were involved in the complained-of adverse employment decision; or (3) Roechner and the City's proffered reason for issuing the one-day suspension was pretextual. For these reasons, summary judgment in defendants' favor on Jackson's First Amendment retaliation claim is proper.[10]

## C.   Jackson's *Monell* Claim Against the City Fails in the Absence of a First Amendment Constitutional Violation by Defendants

A municipality may be liable for a Section 1983 violation only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). As such, there is a basis for municipal liability where there is a widespread practice that is so permanent and well-settled that it constitutes a custom or practice. *Id.* (citing *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007) (cleaned up)). Jackson

---

[10] In his response brief, Jackson, for the first time, raises the argument that General Order 8-4 violates the First Amendment because it is not narrowly tailored. (Dckt. #202 at 22). Jackson's Second Amended Complaint does not include a facial challenge to General Order 8-4 and he "'cannot amend his complaint through arguments in his brief in opposition to summary judgment.'" *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012), *quoting Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002).

alleges that the City had a widespread practice of discrimination and retaliation against African American officers. (Dckt. #64, ¶176).

A municipality, however, cannot be liable under *Monell* when there is no proof of an underlying violation of a plaintiff's constitutional rights by a municipal employee. *See, e.g.*, *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007). For reasons the Court has already explained, defendants' conduct did not violate Jackson's First Amendment rights. Accordingly, because there is no underlying constitutional violation, the City cannot be liable under *Monell. See Sallenger v. City of Springfield*, 630 F.3d 499, 505 (7th Cir. 2010) (citing *Jenkins v. Bartlett,* 487 F.3d 482, 492 (7th Cir. 2007) ("The jury found that Mr. Jenkins' constitutional rights were not violated, thus the City cannot be held liable for any failure to train.") (cleaned up)).

### D. Jackson Has Presented Insufficient Evidence to Raise a Genuine Issue of Fact Regarding Whether His Due Process Rights under the Fifth Amendment Were Violated.

Relying on *Brady v. Maryland*, Jackson contends that defendants violated his Fifth Amendment right to due process by destroying, concealing, or otherwise withholding exculpatory evidence regarding Ward's credibility and the incident at Zobel's Tavern from Jackson and his defense counsel.[11] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

In *Brady*, the Supreme Court held that the prosecution's failure to disclose evidence favorable to an accused "violates due process where the evidence is material either to guilt or to

---

[11] The Joliet defendants argue that *Brady's* obligations do not attach to them because the evidence fails to demonstrate that they were responsible for conducting Jackson's criminal investigation or were otherwise part of the prosecution's team. (Dckt. #191, at 11–12). Jackson responds, without support, that the Joliet defendants were obligated under *Brady* to turn over evidence because they "inserted themselves into the Crest Hill Police Department's criminal investigation." (Dckt. #202, at 37). Even assuming arguendo that a *Brady* obligation did extend to the Joliet defendants, summary judgment on Jackson's Fifth Amendment claim would still be proper because there was no *Brady* violation for the reasons set forth herein.

punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* The *Brady* right, however, is a trial right. As the Supreme Court has said, "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). The domestic battery charges against Jackson were dropped before a trial took place. Because there was no trial, and thus, no verdict adverse to Jackson, there can be no *Brady* violation. *Harris v. Ruthenberg*, 62 F.Supp.3d 793, 797 (N.D.Ill. 2014).[12]

### E. Jackson Has Not Put Forth Sufficient Evidence to Allow a Reasonable Jury to Find in his Favor on his Fourteenth Amendment Claim.

The requirements of procedural due process encompassed by the Fourteenth Amendment apply only to a state's deprivation of life, liberty, or property. *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). In evaluating a due process claim, the Court asks two questions: (1) "whether there exists a liberty or property interest which has been interfered with by the State;" and (2) "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Dupuy v. Samuels*, 397 F.3d 493, 503 (7th Cir. 2005) (citation omitted).

At the outset, the Court notes that Jackson's Fourteenth Amendment claim is unclear. Jackson seemingly claims that he has a protected liberty interest to pursue the occupation of his choice, namely, to become a police sergeant, (Dckt. #204-1 at 89–90), but he fails to raise this point in his opposition to defendants' motions for summary judgment. Jackson also fails to

---

[12] Jackson cites to *Carroccia v. Anderson*, 249 F.Supp.2d 1016, 1024 (N.D.Ill. 2003), for the proposition that an acquittal or dismissal of criminal charges does not extinguish a *Brady* claim. However, *Carroccia* is in tension with the Seventh Circuit's more recent expression of doubt that "an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation," *Carvajal v. Dominguez*, 542 F.3d 561, 570 (7th Cir. 2008), and its observation that other courts "have concluded that a Brady claim is extinguished when a defendant is acquitted or charges are dropped," *see Bielanski v. County of Kane*, 550 F.3d 632, 644–45 (7th Cir. 2008). In any event, *Carroccia* is factually distinguishable because the defendant in that case, unlike Jackson, *was* subjected to a trial. *Carroccia*, 249 F.Supp.2d at 1018.

clarify whether his application(s) to be a police sergeant fall within the two-year statute of limitations, such that his Fourteenth Amendment claim on this issue is timely before this Court. *See Cunliffe v. Wright*, 51 F.Supp.3d 721, 732 (N.D.Ill. 2014) ("Fourteenth Amendment due process claims and §1983 claims have a two-year statute of limitations") (citing *Ashafa v. City of Chicago*, 146 F.3d 459, 461 (7th Cir.1998)).  But even assuming Jackson's application to be a police sergeant was denied and his claim was timely filed, summary judgment is still proper.

While "[t]he concept of liberty protected by the due process clause has long included occupational liberty," *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992) (cleaned up), "[i]t is the liberty to pursue a *calling or occupation*, and not the right to a specific job, that is secured by the Fourteenth Amendment." *Id.* (emphasis added).  In other words, "being a police officer is an occupation," protected by the Fourteenth Amendment, *Wroblewski*, 965 F.2d at 455 (cleaned up), but being a sergeant is not, *Bigby v. City of Chicago*, 766 F.2d 1053, 1057 (7th Cir. 1985).  This alone is fatal to Jackon's Fourteenth Amendment claim because Jackson is still a police officer for the City.

Even assuming this Court could treat being a sergeant as an occupation for purposes of its Fourteenth Amendment analysis, Jackson still cannot succeed on his due process claim because he cannot show that this liberty interest was "interfered with by the State." *Dupuy*, 397 F.3d at 503.

Jackson asserts that Roechner and Perona interfered with liberty interest in his occupation because they damaged his reputation by falsely arresting him for domestic battery and subjecting him to subsequent proceedings.  (Dckt. #202 at 37).  As set forth above, probable cause existed for Jackson's arrest (ending his false arrest allegations), but even assuming that subjecting Jackson to proceedings regarding the domestic battery harmed his reputation, "[m]ere injury to

29

reputation, even if it seriously impairs one's future employment prospects, is not a constitutionally protected liberty or property interest under the due process clause." *Roake v. Forest Pres. Dist. of Cook Cnty.*, 849 F.3d 342, 347 (7th Cir. 2017) (citing cases). "Instead, to state a due process claim based on reputational harm, a plaintiff must show that the government distinctly altered his legal status in addition to tarnishing his good name." *Id.*; *see also Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002).

Here, Roechner and Perona did nothing to alter Jackson's legal status. Rather, reading the facts in the light most favorable to Jackson, defendants, at worst, defamed him. However, as with reputational harm, "mere defamation by the government does not deprive a person of liberty protected by the Fourteenth Amendment, even when it causes serious impairment of one's future employment." *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 617 (7th Cir. 2002) (cleaned up); *Hinkle v. White*, 793 F.3d 764, 768 (7th Cir. 2015) (finding that a plaintiff's legal status was not altered even where defendants' defamation made it "virtually impossible" for him to find new employment in upper-level management of police work). Consequently, neither defendant altered Jackson's legal status, and his due process claim for the denial of a liberty interest fails.[13] *Hinkle*, 793 F.3d at 768 (affirming district court's grant of summary judgment on plaintiff's due process claim where the alleged defamation did not alter his legal status).

---

[13] Jackson also argues in passing that the Crest Hill Police Department's criminal investigation and the JPD's internal investigation were not kept separate in violation of General Order 7-2, and that the "blurring" of the two "raises an inference that Defendants violated Jackson's due process rights." (Dckt. #202 at 36; Dckt. #201-2 at 25). Because Jackson has not developed his arguments on this point, his arguments are waived. *See, e.g.*, *Betco Corp.*, 876 F.3d at 309 (noting that underdeveloped or conclusory arguments in response to motion for summary judgment are waived). Furthermore, even if Jackson were correct and had not waived this argument, the "blurring" of the two investigations did not cause a change in his legal status. Therefore this argument would not suffice to defeat defendants' summary judgment motion on this claim.

**F.      Jackson Has Not Put Forth Sufficient Evidence to Allow a Reasonable Jury to Find in His Favor on His Title VII and Section 1981 Claims.**

Jackson brings claims under Title VII and Section 1981 alleging both race discrimination and retaliation.  The Court will consider Jackson's "claims under Title VII and Section 1981 together . . . because both statutes 'have the same liability standards.'"  *Morris v. BNSF Railway Co.*, 969 F.3d 753, 758 (7th Cir. 2020), *quoting Walker v. Abbott Lab'ys.*, 340 F.3d 471, 474 (7th Cir. 2003).  As such, while the Court will refer only to Title VII throughout the opinion for simplicity, its reasoning applies to Jackson's claims under both statutes.  *Id.*

**1.      Race Discrimination Claim**

When considering a Title VII discrimination claim, like Jackson's, at summary judgment, a court must determine "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race caused the discharge or other adverse employment action."  *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (cleaned up); *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  The Seventh Circuit has recognized two approaches for establishing such discrimination: the *McDonnell Douglas* burden-shifting approach and the "holistic" approach set forth in *Ortiz*.  *See Ortiz*, 834 F.3d at 765–66; *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 891 (7th Cir. 2025); *McKinney v Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017).  Jackson argues his case under both approaches.  The ultimate question in employment discrimination cases is whether the evidence "would permit a reasonable factfinder to conclude that the plaintiff's [membership in a protected class] . . . caused the discharge or other adverse employment action" at issue.  *Ortiz*, 834 F.3d at 765; *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021).

a. **Jackson has failed to present sufficient evidence under the *McDonnell Douglas* burden-shifting approach to survive defendants' summary judgment motion.**

Under the *McDonnell Douglas* burden-shifting approach, a plaintiff has "the initial burden to establish a prima facie case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *Wince*, 66 F.4th at 1040 (cleaned up). To support a prima facie case, a plaintiff must show that: (1) he is a member of the protected class (or engaged in a protected activity); (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class (or who did not engage in protected activity) were treated more favorably. *Id.*; *Lewis*, 909 F.3d at 866.

Here, the parties agree that Jackson is a member of a protected class, and defendants do not dispute that his job performance in general was fine. Instead, defendants assert that Jackson cannot establish his claim under the *McDonnell Douglas* approach because he has not suffered an "adverse action," he has failed to identify any similarly situated employees outside his protected class who were treated more favorably, and he cannot show that their proffered legitimate, non-discriminatory reason for taking action against him was pretextual. The Court agrees on all scores.

i. **Jackson has not identified an "adverse action."**

The initial question before this Court is whether Jackson suffered an adverse action. The Supreme Court recently clarified that a plaintiff alleging discrimination need not show that an employer's action was "serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). Instead, a plaintiff need only allege some disadvantageous harm

"respecting an identifiable term or condition of employment," which leaves the plaintiff "worse off" but not "significantly so." *Id.* at 354–59; *see also Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1337 (7th Cir. 2024) ("Decisions requiring allegations of 'significant' or 'material' injury did not survive *Muldrow*."). As the Seventh Circuit has further clarified, post-*Muldrow*, "the harm need not be 'material' or "significant'" but it "must affect the 'terms or conditions of employment.'" *Arnold v. United Airlines, Inc.*, No. 24-2179, 2025 WL 1778643, at *4 (7th Cir. June 27, 2025), *quoting Muldrow*, 601 U.S. at 355, 353 n. 1. For example, in *Phillips v. Baxter*, No. 23-1740, 2024 WL 1795859, at *3 (7th Cir. Apr. 25, 2024), cited with approval in *Arnold*, the Seventh Circuit, noted that conduct that "did not affect the employee's 'position, job duties, salary, or benefits' was not an adverse action. *Arnold*, 2025 WL 1778643, at *4, *quoting Phillips*, 2024 WL 1795859, at *3.

Jackson alleges that defendants subjected him to an adverse action by (1) causing a humiliating and degrading workplace environment when Roechner and Perona spoke about him at internal meetings and in front of the City Council; (2) subjecting him to an internal investigation; (3) issuing suspensions; and (4) retaliatorily arresting him (even though it is undisputed that he was arrested by the Crest Hill defendants) and subjecting him to prosecution. (Dckt. #202 at 25–26).[14]

---

[14] The Joliet defendants argue that Jackson's complaint contains several other untimely allegations of race discrimination including: (1) then-Lt. Marc Reid's alleged harassment and stalking of Jackson in the 2007 to 2009 timeframe, when Reid supervised Jackson; (2) a 2009 negative performance evaluation issued to Jackson; and (3) the 2013 denial of Jackson's application for a detective specialty assignment. (Dckt. #191 at 19). These actions predate the filing of Jackson's Equal Employment Opportunity Commission charge (which was filed on July 18, 2019) by more than 300 days, thereby rendering them untimely. 42 U.S.C. §2000e-5(e). Furthermore, Jackson fails to respond to this argument and thus any opposition to it has been waived. *See, e.g.*, *Betco Corp.*, 876 F.3d at 309 (noting that underdeveloped arguments in response to motion for summary judgment are waived).

Even considering the facts in a light most favorable to Jackson, he has not shown that these actions affected the terms or conditions of his employment. Jackson is still employed as a police officer in the JPD. He has not provided any evidence that his compensation, vacation time, and working hours were affected. His unpaid suspensions were never served, and the assertedly unwarranted public criticisms that he received were neither severe enough nor pervasive enough to come close to establishing a hostile working environment.

As such, Jackson has failed to present sufficient evidence to raise an issue of material fact as to whether he suffered an adverse action under the standard articulated in *Muldrow*. *See, e.g.*, *Nagle*, 554 F.3d at 1120–21 (an unserved suspension does not constitute an adverse action); *Strickland*, 2024 WL 5118194, at *5 (same); *Arnold*, 2025 WL 1778643, at *5 (finding no adverse action under *Muldrow* where the plaintiff was placed on a performance improvement plan and a reorganization caused some changes in her daily responsibilities because the changes did not adversely affect the terms and conditions of her employment); *Richardson v. National Railroad Passenger Corp.*, No. 24-2517 (SLS), 2025 WL 1568198, at *8 (D.D.C. June 3, 2025) ("unwarranted criticisms" do not meet the adverse action requirement); *Grimes v. Dept. of Defense*, No. 1:24-cv-1164-MSN-IDD, 2025 WL 1334054, at *5 (E.D.Va. May 7, 2025) ("Comments, even offensive ones, and criticisms of Plaintiff's work do not rise to the level of severe or pervasive harassment."); *Vaughn v. Illinois Dept. of Human Services*, No. 1:22-cv-1107, 2024 WL 454938, at *4 (C.D.Ill. Feb. 6, 2024), *quoting Pantoja v. Am. NTN Bearing Mfg. Co.*, 495 F.3d 840, 847 (7th Cir. 2007) ("[N]ot every criticism or disciplinary measure is an 'adverse employment action' for Title VII purposes.").[15]

---

[15] Jackson asserts that "in certain circumstances where, as here, an internal affairs unit continuously holds an employee 'under investigation,' courts in the Seventh Circuit have found that an employee has suffered an adverse action for purposes of Title VII." (Dckt. #202 at 26 (citing *Barron v. University of Notre Dame Du Lac*, 93 F.Supp.3d 906, 913 (N.D.Ind. 2015)). However, *Barron* does not support this

ii.     **Jackson has failed to demonstrate similarly situated employees outside the protected class were treated more favorably.**

Assuming a jury could draw the inference that defendants took adverse action against Jackson, his Title VII claims would still fail because he has failed to provide evidence that a similarly situated person who is a non-African American was treated more favorably than him by defendants.  As the Seventh Circuit has explained, "[a]ll things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination.  The 'similarly situated' prong establishes whether all things are in fact equal."  *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (cleaned up).  "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Id.*, at 847 (cleaned up).  Although whether a comparator is similarly situated is usually a question of fact, summary judgment is appropriate "when no reasonable fact-finder could find that plaintiffs have met their burden on the issue."  *Id.* at 846–47 (cleaned up).

Here, Jackson compares himself to eight proposed comparators, however, he puts forth no evidence which demonstrates that he and any of the proposed comparators dealt with the same supervisor (i.e. Roechner).  (*See* Dckt. #202 at 27–28).  This alone would end his claim, but for defendants' admission that a few of the comparators were involved in situations that involved Roechner's decision-making.[16]  (Dckt. #232 at 16).  Of those alleged comparators, one

---

proposition.  The decision makes no reference to holding the plaintiff "under investigation" or to "an internal affairs unit."  Instead, it concerns a plaintiff college professor who claimed that the defendant university denied her tenure based on her sex.

[16] *Coleman*, 667 F.3d at 847 (explaining that "the similarly-situated requirement normally entails the existence of a common supervisor" because the "inference of discrimination is weaker when there are different decision-makers.") (cleaned up).

(Heavener) was exonerated of any wrongdoing after an internal investigation, (*see* Joliet PSOF Resp. ¶84), and, for another (Zilka), Jackson presents no evidence that she was convicted of any crime or violated any Police Department order.  (*See* PSOF ¶79).  Thus, neither Heavner nor Zilka were an appropriate comparator.  Jackson also asserts that Patrick Cardwell, who (like Jackson) communicated with the media, is a comparator.  (*See* Joliet PSOF Resp. ¶¶27, 29).  However, it is undisputed that Cardwell gave Chief Roechner a "head's up" about his plans to communicate with the media, which Roechner perceived to satisfy the preauthorization requirements of General Order 8-4.  (*See* JSOF ¶118; Dckt. #189-1, Declaration of A. Roechner, ¶6).  As a result, Cardwell's conduct does not compare to Jackson's failure to seek prior approval from Roechner, which renders Cardwell an invalid comparator.  In light of these deficiencies, Jackson has failed to present sufficient evidence that would allow a reasonable jury to find that he has established a *prima facie* case of race discrimination or retaliation.

### iii. Jackson has failed to produce sufficient evidence to raise a genuine dispute as to whether defendants' stated reasons for issuing him suspensions were pretextual.

Even assuming that Jackson established a *prima facie* case with respect to defendants' alleged adverse employment actions, he has failed to produce sufficient evidence to allow a reasonable jury to find pretext.  Pretext is a "lie, specifically a phony reason for some action."  *Russell v. Acme–Evans, Co.*, 51 F.3d 64, 68 (7th Cir. 1995).  In order to demonstrate a material issue of fact as to pretext Jackson must show that "(1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or

(2) that an employer's explanation is not credible." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004) (citing *Guerrero v. Ashcroft*, 253 F.3d 309, 313 (7th Cir. 2001)).

Roechner explained that he issued Jackson a one-day suspension for failing to seek permission before speaking to the media about department affairs. Jackson has not offered any evidence that, if believed by a trier of fact, would demonstrate that Roechner's proffered justification for the decision was merely pretextual, particularly given that Roechner issued discipline to two white officers for the same misconduct, (JSOF Resp. ¶¶32,[17] 119), and Roechner himself was disciplined for speaking to the media without permission, (*id.* ¶31). The same is true of Jackson's thirty-day suspension, in light of the evidence that Roechner issued a white officer a thirty-day suspension for his involvement in a domestic battery incident. (*Id.* ¶108). Accordingly, Jackson has failed to demonstrate how his employer's explanation for the adverse actions is not credible.

      **b. Jackson has failed to present sufficient evidence to survive defendants' motion for summary judgment under the *Ortiz* holistic approach.**

Under the "holistic" approach discussed in *Ortiz*, the Court assesses the evidence as a whole, rather than asking whether any particular piece of evidence proves the case by itself. *Arnold*, 2025 WL 1778643, at *3. In particular, Jackson "may prove discrimination in a holistic fashion, by proffering direct or circumstantial evidence of intentional discrimination." *Wince*, 66 F.4th at 1040 (cleaned up). Circumstantial evidence demonstrating intentional discrimination includes: (1) suspicious timing, ambiguous oral or written statements, or behavior toward or

---

[17] Jackson claims this fact is not admissible under the Federal Rules of Evidence based on his belief that defendants failed to establish a foundation for the assertion and that it contains hearsay. (JSOF Resp. ¶32). Jackson cites evidence that does not actually dispute defendants' proffered fact and fails to explain how Roechner's testimony constitutes hearsay. In these instance, defendants' fact is supported and deemed admitted.

comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action. *Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 659–60 (7th Cir. 2013).

      In addition to his arguments—addressed above and found wanting—that he suffered an adverse action, that defendants treated similarly situated white officers more favorably than him, and that defendants' explanation for their treatment of him is pretextual, Jackson relies on evidence that Roechner used a derogatory term to refer to African Americans within the JPD to meet his burden under the holistic approach. (Dckt. #202 at 24–29). In particular, Jackson has offered testimony from another witness that the offensive term "shithead" —which courts have noted has been used in other contexts to refer to a variety of groups[18]—is commonly used by the JPD to refer to African Americans, and that the witness heard Roechner use in that term on "several occasions" though there is no evidence that he used the term with reference to Jackson. (Dckt. #203-1 at 57, 59); *see also Sinnott v. City of Joliet*, No. 20-CV-7591, 2023 WL 374296, at *7 (N.D.Ill. Jan. 24, 2023) (likewise noting that "the term 'shithead' was 'essentially another kind of slang derogatory term for African Americans' within the Joliet police department" and that Roechner had used the term). Jackson also relies on the findings within the AG's investigative report, which provides circumstantial evidence of a discriminatory atmosphere within the JPD. (Dckt. #261 at 4–7; *supra* at Section I).

---

[18] *See, e.g., Taxi Connection v. Dakota, Minnesota & E. R.R. Corp.*, 513 F.3d 823, 824 (8th Cir. 2008) (term used to refer to female—but not male—drivers); *See Durand v. FedEx*, No. 12-cv-7450-WJM-MF, 2015 WL 140215, at *8 (D.N.J. Jan. 12, 2015) (term used to refer to Peruvians); *Moren v. Progress Energy, Inc.*, No. 8:07-CV-1676-T-17, 2008 WL 3243860, at *1 (M.D.Fla. Aug. 7, 2008) (term used to harass a white male).

This Court does not condone the use of the thoroughly disgusting term "shithead" towards African Americans or any other group in the workplace. Nonetheless, even presuming a reasonable jury could find that Roechner's use of the term reflects his bigotry towards African Americans, his "'bigotry, *per se*, is not actionable. It is actionable only if it results in injury to [Jackson]; there must be a real link between the bigotry and an adverse employment action.'" *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003), *quoting Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001); *Harper v. Fulton Cnty.*, 748 F.3d 761, 766 (7th Cir. 2014) (same); *see also Huff v. UARCO, Inc.*, 122 F.3d 374, 385 (7th Cir. 1997) (decisionmaker's discriminatory "remarks unrelated to the employment decision in question may not overcome summary judgment if they stand alone as evidence of the employer's discriminatory intent."); *Henderson v. Wilkie*, No. 18 CV 04685, 2020 WL 2494648, at *7 (N.D.Ill. May 14, 2020) (same). Similarly, although the circumstantial evidence of a general atmosphere of discrimination within the JPD is probative and can be considered under the *Ortiz* framework, such evidence "is not the equivalent of proof of discrimination against an individual." *Conway*, 825 F.2d at 598 (cleaned up); *Martin*, 2017 WL 1316255, at *28–29.

As discussed above, Jackson did not suffer an adverse employment action. Moreover, Jackson has failed to present sufficient evidence that would allow a reasonable jury to find that he was treated differently than similarly situated white officers or that defendants' reasons for taking action against him were pretextual. Under these circumstances, Roechner's use of a derogatory reference towards African Americans and the evidence of a discriminatory atmosphere within the JPD does not—without more—provide sufficient evidence to allow Jackson's claim to survive summary judgment under the holistic approach. *See, e.g.*, *Johnson v. McDonald*, No. 15-CV-11092, 2020 WL 374679, at *14 (N.D.Ill. Jan. 23, 2020) (plaintiff's

claim related to his non-selection for sergeant did not meet the *Ortiz* test even though the decisionmaker "had a history of questionable statements and potentially discriminatory behavior" where the sergeant promotion followed normal procedures and the sergeant decision was made by other decisionmakers); *Henderson*, 2020 WL 2494648, at *7 (where "[n]othing about the selection process or promotion outcome . . . suggest[ed] discriminatory or retaliatory motive . . . the Court cannot conclude that [the decisionmaker's] past discriminatory statements, while improper in any context and least of all [in] a workplace serving our Veterans, made independently of this process render it suspect."); *Martin*, 2017 WL 1316255, at *28–29; *cf. Sinnott*, 2023 WL 374296, at *7 (denying summary judgment in a race discrimination hiring case where in addition to evidence of Roechner's use of the term shithead, plaintiff presented circumstantial evidence of pretext and evidence that he overheard Roechner stating that "he did not want to hire another Black male" during an event that was part of the hiring process for plaintiff's application).

### 2.    Retaliation Claim

Jackson also alleges that defendants retaliated against him in violation of Title VII. Jackson generally skips over his retaliation claims in his summary judgment filings, alleging that defendants did not challenge them. On the contrary, defendants combined their argument due to the overlapping elements. As the Court understands it, Jackson alleges that some or all of the allegedly adverse actions that support his discrimination claim also support his retaliation claim. (*See* Dckt. #64 ¶¶198–202).

To prevail on a retaliation claim, a plaintiff must prove that "(1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lewis*, 909 F.3d at 866. Again, for

the reasons set forth above, Jackson has not demonstrated that the adverse actions he alleges he endured are actionable under Title VII. Similarly, even assuming they are, Jackson has not put forth any adequate comparators. For these reasons, his retaliation claims must also be dismissed. *Allen v. Benton*, No. 18-CV-4047, 2022 WL 18147674, at *14 (N.D.Ill. Feb. 25, 2022) (granting summary judgment on retaliation claim where the plaintiff did not "provide adequate comparators" because he "did not find people who eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel.") (cleaned up).

### G. Summary Judgment on Jackson's Remaining Federal Claims Is Proper Because He Has Abandoned Them.

In his Second Amended Complaint, Jackson also complained that (1) defendants violated his due process rights under the Fourteenth Amendment by destroying, concealing, or otherwise withholding exculpatory evidence; (2) defendants conspired to arrest Jackson in violation of his civil rights under 42 U.S.C. §1985; (3) the Joliet defendants used the JPD General Orders to silence BPOA members and officers who complained about race discrimination, causing a disparate impact based on race; and (4) defendants engaged in discriminatory conduct which deprived Jackson of the opportunity to enter one or more contracts for housing. (Dckt. #64 ¶¶169, 172, 186, 206). Defendants addressed these claims in their supporting memorandum and asserted that they were not meritorious for several reasons. (*See generally* Dckt. ##181, 191). Jackson, however, did not meaningfully address these claims in his response brief, let alone rebut defendants' rationale for why they should be granted summary judgment on them. (*See* Dckt. ##202, 207). Consequently, the Court finds that Jackson has abandoned these claims. *See, e.g., Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 374 & n.2 (7th Cir. 2020); *Kovaco v. Rockbestos-Surprenant Cable Co.*, 834 F.3d 128, 142–44 (2d Cir. 2016).

### H.     The Court Relinquishes Jurisdiction Over Jackson's State Law Claims

For the reasons set forth above, summary judgment is warranted on Jackson's federal claims and only Jackson's state law claims against the defendants for intentional infliction of emotional distress, false arrest / false imprisonment, and malicious prosecution remain.  The Seventh Circuit has described a "sensible presumption that if the federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007).  Accordingly, the Court, in its discretion, declines to exercise supplemental jurisdiction over Jackson's pendent state law claims. *See Carlsbad Tech. Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."); 28 U.S.C. §1367(c)(3).  Jackson's state law claims against defendants are dismissed without prejudice so that they may be pursued in a state forum. *Doxtator v. O'Brien*, 39 F.4th 852, 867 (7th Cir. 2022) ("Without any federal claims over which it had original jurisdiction, the district court's decision not to exercise supplemental jurisdiction over the pendent state law claims was not an abuse of discretion.").

## CONCLUSION

For the reasons stated above, plaintiff's motion to supplement the record, (Dckt. #260), is granted, defendants' motions for summary judgment, (Dckt. ##180, 187), are granted as to plaintiff's federal claims, and plaintiff's state law claims are dismissed without prejudice.

**Date: July 15, 2025**

**Jeffrey I. Cummings**
**United States District Court Judge**